**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **TELLABS OPERATIONS, INC.** | ) | |
| | ) | **No. 08 C 3379** |
| **Plaintiff,** | ) | |
| | ) | **No. 09 C 4530** |
| **v.** | ) | |
| | ) | |
| **FUJITSU LIMITED AND FUJITSU** | ) | **Chief Judge Holderman** |
| **NETWORK COMMUNICATIONS, INC.,** | ) | **Magistrate Judge Cole** |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |
| **FUJITSU LIMITED,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | |
| **TELLABS OPERATIONS, INC, ET AL., )** | | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

**INTRODUCTION**

In January 2008, Fujitsu Limited ("Fujitsu") filed suit against Tellabs Operations, Inc. ("Tellabs") in the Eastern District of Texas, charging it with infringing three of Fujitsu's patents for optical amplifiers.[1] A few months later, in June, Tellabs filed a patent infringement suit in the Northern District of Illinois against Fujitsu, alleging that it infringed Tellabs' Patent No. 7,369,772. Fujitsu filed a counterclaim in that case, claiming that Tellabs had infringed yet another of Fujitsu's patents, No. 7,227,681. Fujitsu's Texas suit was transferred here and consolidated with the Illinois suit for the purposes of discovery.

---

[1] Nos. 5,521,737 ("737"); 5,526,163 ("163"); and 5,386,418 ("418").

Before turning to the question raised by the motion for protective order, it is appropriate to express the court's appreciation to counsel for both sides for the extraordinary degree of professionalism with which they have comported themselves. Discovery may well be the bane of modern litigation, *Rossetto v. Pabst Brewing Co., Inc*., 217 F.3d 539, 542 (7th Cir. 2000)(Posner, J.), but this case shows that it need not be fractious, and that lawyers can fulfill their obligation to participate fully and fairly in discovery without sacrificing in the slightest their obligations to their clients. That there have been so few discovery disputes requiring the court's involvement is a testament to the way in which counsel have dealt with each other.[2]

The question for resolution is whether Fujitsu is entitled to a protective order prohibiting Tellabs from taking discovery regarding Fujitsu's inspection in 2006 of Tellabs' optical scanner. Fujitsu argues that the inspection was conducted by its own employees, who were specially assigned to that task in anticipation of litigation and, since they will not be testifying at trial, their endeavors are protected by the work product doctrine and Rule 26(b)(4)(D), Federal Rules of Civil Procedure.[3] Codified at Rule 26(b)(3) of the Federal Rules of Civil Procedure, the work-product doctrine is designed to protect an attorney's thought processes and mental impressions against disclosure and to limit the circumstances in which attorneys may piggyback on the fact-finding investigation of their adversaries. *See Hickman v. Taylor*, 329 U.S. 495 (1947); *Sandra T.E. v. South Berwyn School Dist. 100*, 600 F.3d 612, 621-622 (7th Cir.2010). Rule 26(b)(4)(D) prohibits discovery by one party of "facts known or opinions held by an expert who has been retained or specially employed by

---

[2] Fujitsu is represented by, among others, Messrs. Van Dyke, Brooks, McConville, Wang, Wine, Isackson and Ms. Lock. Telllabs is represented by, among others, Messrs. Bradley, O'Malley, Dodd, Leftwich, Kelly, and Ms. Conaty.

[3] Inspections were also conducted in 2008, but they are not implicated by the motion. (*Tellabs' Response*, at 1, 8).

another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial."

Resolution of the current controversy is complicated by the parties' competing assessments of the underlying facts, their disagreement over application of the relevant legal principles, and the lack of unanimity among the lower courts about the meaning of Rule 26(b)(4)(D).[4]  Wright and Miller, in their treatise on Federal Practice and Procedure, have said that the number of situations in which the protective provisions of the Rule would come into effect is small.  In their view, "[t]here is a legitimate concern that a party may try to immunize its employees who are actors or viewers against proper discovery by designating them experts retained for work on the case," and they warn that "courts should be exceedingly skeptical when employees who have otherwise discoverable information are designated 'experts,' and efforts must be made to preserve the opportunity to discovery that information."  8A Wright, Miller, & Marcus, Federal Practice & Procedure, §2033 at 126 (2010). That caution finds proper application in this case.

# I.

## THE INSPECTIONS

In 2005, Tellabs pulled off what industry commentors called a "surprise upset" over Fujitsu and others in  the optical networking world by cutting a deal with Verizon Communications, Inc., for the sale of more than a quarter billion dollars of optical transport equipment. (*Tellabs' Response*, Ex. C).  When Fujitsu's stunned  representatives spoke with Verizon to find out what happened, they were told, among other things, that Tellabs ' 7100 optical amplifier was more advanced than

---

[4] 26(b)(4)(D) is the current designation under the December 1, 2010 Amendments to Rule 26.  The Rule was previously designated as 26(b)(4)(B).

Fujitsu's, and that Fujitsu had to innovate to catch up. Fujitsu's amplifier technology was described as "old," and its product "weak." (*Tellabs' Response*, Exs. E, F). Fujitsu was in a state of what may fairly be called corporate panic.

In a September 2005 document captioned "Post Mortem & Question/Request," Fujitsu expressed an urgent need to catch up to Tellabs, about which the document lamented Fujitsu knew "nothing at all." The document stressed that for the "future recovery on FW 7500 program we must know the details of whom we are competing. ... The best way is to learn it directly from product itself. ... The Fujitsu must seriously study about our AMP philosophy once more time, since it is true that [Verizon] indicated our AMP is behind. ... Therefore we must have serious research of AMP on Market/Competitor. [Fujitsu] needs FNC to support this research. Especially, the Transition response time, the dynamic adjustment can NOT be researched by paper or written document. Only equipment can let us know. [Fujitsu] seriously request FNC to look for the possibility to buy Tellabs equipment. PLEASE!" (*Tellabs' Response*, Ex. I)(caps emphasis in original). [5]

In October 2005, Fujitsu sent to six of its engineers an anguished e-mail in anticipation of an "after business hours" discussion. The e-mail repeated what was in the September Post Mortem, saying that Fujitsu "must seriously study about our AMP philosophy once more time, since it is true that [Verizon] indicated our AMP is behind . ... Therefore, we must have serious research of AMP on Market/Competitor. [Fujitsu] needs FNC to support this research", which the e-mail said "can NOT be researched by paper or written document. Only equipment can let us know." The email again implored FNC to try to buy Tellabs' equipment. "PLEASE!" In this way, Fujitsu hoped to "leap frog" Tellabs' technology. (*Tellabs' Response*, Ex. G)(caps emphasis in original).

---

[5] The document is quoted verbatim, with grammatical errors uncorrected.

Fujitsu's own documents make undeniable the fact that Fujitsu was consumed by the perceived need to acquire the competing product so that it could "learn... directly from the product itself." (*Tellabs' Response*, Ex. I). One of the six individuals to whom the email was sent was Hiroyuki Itou, one of the three engineers who eventually would inspect the equipment, and who Fujitsu claims was not routinely involved in the examination of competitors' equipment for business purposes. (*Tellabs' Response*, Ex. G).[6] A Tellabs 7100 Optical Scanner was obtained through eBay in August 2006 by Ted Van Ryn, who headed the competitive intelligence group at FNC. (*Tellabs' Response*, Ex. J). The total weight of the equipment purchased was 1,400 lbs. in two crates and 18 pallets. Van Ryn took the steps necessary to ensure that the identity of the purchaser was unknown to the seller. (Ex. I, J). Three modules, each of which was an optical amplifier was inspected by Fujitsu. Engineers in Japan.

In support of the motion for a protective order, Fujitsu attached an affidavit from FNC's general counsel, Melanie Wright, who swore that the allegations in her affidavit were true and that they were based upon her personal knowledge. Ms. Wright's affidavit made no mention of the email just a few months earlier in which Fujitsu was desperately seeking to purchase a Tellabs optical scanner so that inspections could be conducted for what were obviously business and competitive reasons. She asserted that:

> Beginning in the Spring of 2006, I worked with staff members from the Legal and Patent Departments of FNC and Fujitsu and other FNC and Fujitsu employees to investigate *the possibility* that products sold by the Tellabs defendants (collectively "Tellabs") infringed one or more patents owned by Fujitsu. I oversaw and at times helped to coordinate the activities of these employees in conducting the Tellabs investigation. As part of investigation into Tellabs products, FNC employees, in

---

[6] As we shall see, his involvement in 2005 and thereafter is a fact of significance. *See infra* at 29.

October 2006, purchased some salvaged Tellabs equipment and supporting documentation advertised on e-Bay's™ website by an equipment dealer named GaTechSales. The Tellabs equipment, which consisted of various modules from the Tellabs 7100 Optical Transport System, and the supporting documentation were available to any member of the general public willing to pay the "Buy It Now" purchase price listed on the site. *(See,* Exhibit A hereto.) No confidentiality restrictions of any kind were placed by GaTechSales or eBay™ on the equipment or its sale. (See, Exhibit A.).

(*Fujitsu's Motion*, Wright Decl., ¶ 2)(emphasis supplied).

Thus, while the in-house documents leading up to the purchase evince a concern that Fujitsu had fallen behind Tellabs' technology and that urgent business interests necessitated the purchase and inspection of a Tellabs optical scanner, Ms. Wright states that the purchase and inspection of the Tellabs equipment were driven by the possibility that Tellabs might have infringed Fujitsu's patents. The affidavit is silent on the basis of this conjecture and says nothing about the investigation so desperately sought by Fujitsu after losing the Verizon contract.[7]

Ms. Wright goes on to state that, when the Tellabs products arrived from e-Bay, a number of the modules were damaged; which ones she conveniently does not say. "FNC scrapped most of these," she claimed, and "a small number were shipped to Fujitsu, along with a single set of technical manuals that accompanied the modules. . . ." (*Fujitsu's Motion*, Wright Decl., ¶ 2). Ms. Wright submits that:

with [her] knowledge and oversight and under the direction of Fujitsu Legal and Patent Department staff members, three Fujitsu engineers were specially commissioned by Fujitsu's legal team to inspect three of the Tellabs modules. This inspection was carried out specifically for the purpose of assisting Fujitsu and FNC in determining whether to enforce Fujitsu's intellectual property rights against Tellabs.

---

[7]It surely was not supported by anything in the internal documents of Fujitsu beginning in October 2005 in response to Verizon's purchase of the Tellab's optical scanners.

(*Fujitsu's Motion*, Wright Decl., ¶ 3 (footnotes omitted)). She claims that the inspection of competitors' products was not among the three engineers' ordinary duties. (*Fujitsu's Motion*, Wright Decl., ¶ 3 n.1). According to Ms. Wright,

> [a]s a significant part of the process for determining whether to enforce Fujitsu's intellectual property rights against Tellabs, Fujitsu and FNC both contemplated the distinct possibility that it would be necessary to file suit against Tellabs for infringement of Fujitsu's patents. [She] participated in an intermediate attempt to license Fujitsu's patents to Tellabs, in the hopes that we might be able to settle this dispute and avoid litigation. However, planning for the possibility of litigation continued in the background of our licensing efforts, [she] pointedly d[id] not use the phrase "licensing negotiations" to refer to these efforts, because there were no real negotiations between the parties. Rather, Tellabs made it clear from the beginning that they had no interest in negotiating anything. When it became clear Tellabs would not respect Fujitsu's patents, the decision was made to initiate a patent infringement lawsuit against Tellabs - a decision which, again, legal management from Fujitsu and FNC had all along recognized as a distinct possibility.

(*Fujitsu's Motion*, Wright Decl., ¶ 4). As noted, Fujitsu filed an infringement suit in January 2008, in the U.S. District Court for the Eastern District of Texas. (*Fujitsu's Motion*, Wright Decl., ¶ 4).

Curiously, Fujitsu initially contended that the attorney-client privilege precluded Ms. Wright from even being deposed on her affidavit. That objection was overruled and the deposition proceeded. It was revealing. As it turned out, much of what Ms. Wright said in her affidavit was not based on personal knowledge, and a good deal of what she said in the affidavit was open to serious question, to say the very least. She had no knowledge of what triggered the inspection, be it concerns over infringement or concerns over falling behind competitors. (*Tellabs Response*, at 9, Ex. N; Wright Dep., at 14). She had no knowledge whether the Tellabs equipment was originally purchased for a purpose unrelated to litigation. (*Id*.; Wright Dep., at 61). She didn't select the Tellabs products that were to be inspected. (*Id*; Wright Dep., at 14)).

7

Although she claimed to have overseen and coordinated the activities of the employees conducting the inspection, she didn't choose the engineers who performed the inspection, didn't know what their ordinary duties were, didn't have any communications with them, and it appears she never saw whatever report they issued. (*Tellabs Response*, Ex. P; Wright Dep., at 49-55). Moreover, she had no personal knowledge regarding the claimed destruction of some of the Tellabs equipment – she only knew what she was later told. And, in some instances, she didn't know who told her. (*Tellabs Response*, Ex. N; Wright Dep., at 45-47, 67-68); Ex. P; Wright Dep., at 67-71). In fact, it was Hitoshi Fuji, a non-lawyer, from Fujitsu Ltd.'s Patent Division who directed the inspection. (*Tellabs Response*, Ex. N (Wright Dep., at 63-71, 77-78); Ex. P (Wright Dep., at 67-71). Ms. Wright's affidavit made no mention of Mr. Fuji's involvement.[8]

These significant deficiencies in Ms. Wright's affidavit were pointed out in Tellabs' response to Fujitsu's motion, which contained a comprehensive and illuminating chart comparing the deposition testimony with the assertions in her affidavit. (*Tellabs Response* at 9; Ex.N). The response fairly described her affidavit as "misleading." (Response at 11). Given what proved to be the limited nature of Ms. Wright's personal knowledge and Mr. Fuji's pivotal role in the inspections, it is odd that Mr. Fuji's affidavit was not offered along with Ms. Wright's. Nor were the affidavits of any of the three engineers who conducted the actual inspection.

Perhaps recognizing that it could not make out its case based on the Wright affidavit – a point made in Tellabs' response (at 9) -- Fujitsu attached Hitoshi Fuji's far more expansive affidavit to its reply brief. This, of course, was too late. "A reply brief is for replying" not for raising

---

[8] While the report was no doubt in Japanese, one would have thought that the general counsel who claimed to have directed and overseen the whole endeavor would have received a translated version.

essentially new matter that could have been advanced in the opening brief. *Hussein v. Oshkosh Motor Truck Company,* 816 F.2d 348, 360 (7th Cir. 1987)(Posner, J., concurring). Arguments and evidence that could have been raised in the opening brief but are first raised in a reply brief are waived. *Judge v. Quinn,* 612 F.3d 537, 542 (7th Cir. 2010); *Cornucopia Institute v. U.S. Dept. of Agriculture,* 560 F.3d 673, 678 (7th Cir. 2009); *Massenberg v. A & R Security Services, Inc*., 2011 WL 1792735, *6 (N.D.Ill. 2011)(Holderman, C.J.). But when asked at oral argument about the timing of the affidavit, counsel for Tellabs chose not to object. The beneficiary of a waiver can freely surrender the benefit of the waiver. And Tellabs chose to do so. *Nunez v. United States*, 546 F.3d 450, 452 (7th Cir. 2008). And so, we turn to the Fuji affidavit.

Mr. Fuji, like Ms. Wright, claimed to have first hand knowledge of the statements in his affidavit. *Cf*., Rule 602, Fed.R.Evid. But like that representation in Ms. Wright's affidavit, the statement was not wholly accurate. Mr. Fuji worked for Fujitsu Ltd. for over 29 years and was with its Patent Division during the inspection. (*Fujitsu's Reply*, Fuji Aff., ¶¶2-3). The Patent Division worked with the Legal and Intellectual Property Unit concerning investigations and enforcement of Fujitsu's patents. (*Fujitsu's Reply*, Fuji Aff., ¶3). Mr. Fuji lists his responsibilities as the drafting and review of patent applications, contracts and license agreements, evaluating allegations of infringement presented by third parties against Fujitsu in preparation for litigation, and investigating potential infringement of Fujitsu's patents by third parties in preparation for potential litigation. (*Fujitsu's Reply*, Fuji Aff., ¶3). He is not an attorney in any jurisdiction. (*Fujitsu's Reply*, Fuji Aff., ¶4). Mr. Fuji says that "[o]ther than in [his] role to investigate potential infringement of Fujitsu's patents, [he] was not involved in any investigation or evaluation of any competitor's products" and has "not and do[es] not perform any competitive intelligence analysis for Fujitsu." (*Fujitsu's Reply*,

9

Fuji Aff., ¶4).

In 2003, Fujitsu Limited's General Counsel, Masanobu Katoh, asked Mr. Fuji to ramp up his "efforts to investigate potential infringement of Fujitsu's patents by third parties for purpose of enforcement and licensing of Fujitsu patents." (*Fujitsu's Reply*, Fuji Aff., ¶5). Mr. Fuji was "involved with special teams that investigated several third party companies. . . .investigat[ing] both the patent portfolio of the third party companies as well as their products in view of Fujitsu's patent portfolio." (*Fujitsu's Reply*, Fuji Aff., ¶5). He said such investigations "were independent of any business-related investigations, [such as] 'post-mortem' bid evaluations, [*see e.g., Tellabs' Response*, Exhibit I],or competitive analysis investigations conducted by Fujitsu Business Units for Optical Communications." (*Fujitsu's Reply*, Fuji Aff., ¶5).[9]

Mr. Fuji related how the inspections came about:

In 2006, I was on a team that investigated Tellabs' potential infringement of Fujitsu patents and determined that there were patents within Fujitsu's portfolio that may be relevant to or infringed by Tellabs' products. A thorough infringement analysis could not be conducted initially, because of the lack of specific information describing Tellabs' products. In Spring 2006, the investigative team, including some members of the Industry Relations Division and myself, held conferences with Fujitsu Limited's management and FNC's legal department to seek guidance, assistance and instruction as to what to do from a legal perspective to determine whether Tellabs infringed one or more of Fujitsu's patents. Members of the Industry Relations Division and FNC's legal department, including Melanie Wright, provided us with legal guidance, including legal strategy and advice, regarding what information was needed, and why this information was needed, to complete the infringement analysis. As a result of these conferences, it was concluded that physical samples of the Tellabs products should be obtained for inspection, so we could get the information needed to complete our infringement analysis and prepare for discussions with Tellabs regarding Fujitsu's enforcement of its patents through licensing and/or litigation.

---

[9] One of the significant documents turned over in discovery by Fujitsu was labeled "Post Mortem." *See supra*, at n. 4 (Exhibit E).

(*Fujitsu's Reply*, Fuji Aff., ¶6).

Mr. Fuji explained that the equipment was purchased in an eBay auction in August 2006 by FNC, and a "subset" of it was sent to his attention by Mr. Van Ryn. (*Fujitsu's Reply*, Fuji Aff., ¶7). Ms. Wright, and others within the Industry Relations Division of Fujitsu Ltd., and FNC, requested Mr. Fuji to "controll[] the logistical aspects of the inspection and [take] . . . responsib[ility] for having the inspection performed and for reporting the results of the inspection to them." (*Fujitsu's Reply*, Fuji Aff., ¶7).

Mr. Fuji selected "three Fujitsu Limited engineers - Hiroyuki Itou, Tomoaki Takeyama, and Haruhiko Tabuchi. . . to conduct, under [his] supervision, an inspection of the Tellabs optical amplifier modules received from FNC." (*Fujitsu's Reply*, Fuji Aff., ¶8). Mr. Fuji stated in his affidavit that:

> Mr. Itou and Mr. Takeyama were both engineers in the Photonic Systems Business Unit. In 2006, their regular employment duties involved the development of new products for Fujitsu Limited and solving engineering issues relating to Fujitsu Limited products. Neither Mr. Itou nor Mr. Takeyama performed business evaluations of competitor products. The third engineer, Mr. Tabuchi, was a member of Fujitsu Laboratories Limited's Intellectual Property Group and, in 2006, his normal job responsibilities included the development and promotion of intellectual property for Fujitsu Laboratories Limited. As with the other engineers that conducted the 2006 inspections, Mr. Tabuchi did not have responsibility for competitive intelligence activities.

(*Fujitsu's Reply*, Fuji Aff., ¶8). Mr. Fuji claimed that "none of the three engineers had, as a normal job responsibility, the task of assessing whether third party products infringed Fujitsu's patents." (*Fujitsu's Reply*, Fuji Aff., ¶8). Instead, he said he selected them because they each had considerable experience and skills working in optical amplifier technology and had a knowledge of Fujitsu's patent portfolio. (*Fujitsu's Reply*, Fuji Aff., ¶8).

Pursuant to his assignment from Ms. Wright and the Industry Relations Division, Mr. Fuji said he told the engineers to inspect the equipment. (*Fujitsu's Reply*, Fuji Aff., ¶9). He said he then discussed the results with Ms. Wright in several telephone calls from October 2006 through early 2007. (*Fujitsu's Reply*, Fuji Aff., ¶9). None of this appeared in Ms. Wright's affidavit. Mr. Fuji said he also reported the results to Masanabou Katoh. (*Fujitsu's Reply*, Fuji Aff., ¶9). In addition, he participated in the licensing discussions with Tellabs that preceded this litigation until "it appeared Tellabs did not care about Fujitsu's patents," at which point he "participated in the decision with Ms. Wright and others at Fujitsu Limited and FNC to bring suit against Tellabs for patent infringement." (*Fujitsu's Reply*, Fuji Aff., ¶9).

While Tellabs may have waived its objection to Mr. Fuji's belated affidavit, basic fairness required that Tellabs be given the opportunity to depose Mr. Fuji and to file an appropriately limited surreply. *See Fenster v. Tepfer & Spitz, Ltd.*, 301 F.3d 851, 859 (7th Cir. 2002). When Mr. Fuji was deposed, it turned out that there were a few holes in his story, too. It is a reasonable inference from the "Post Mortem" and email traffic in September and October 2005, that Mr. Itou was to have a role in the desperately sought inspection of the Tellab's optical amplifier. *See supra* at 5.[10] So Mr. Fuji's dogmatic assertion in this regard was open to question, at the very least. (*Fujitsu's Reply,* Fuji Aff., ¶ 8).

---

[10] During the argument on the motion following the submission of the surreply, counsel for Fujitsu took the position that it was speculation to infer anything from the fact that Mr. Itou was copied on the 2005 e-mail regarding the urgent and desperate need to obtain and test Tellabs' optical sensors. He did not, however, offer any alternative thesis as to why Mr. Itou might have been included on the mail that was sent only to 6 people. A reasonable inference is one that is plausible and that flows logically from the facts alleged, including any objective indications of candor and good faith. *See Greenstone v. Cambex Corp.,* 975 F.2d 22, 26 (1st Cir.1992)(Breyer, C.J.). Here, as always, human experience and common sense have a role to play. *Cf. Donnelly v. United States*, 228 U.S. 243, 277-78 (1913)(Holmes, J., dissenting)("The rules of evidence in the main are based on experience, logic, and common sense....").

Mr. Fuji was in fact wrong when he said that Mr. Tabuchi had no responsibility for assessing whether other companies' products infringed Fujitsu's patents. (*Fujitsu's Reply,* Fuji Aff,. ¶ 8). He had to concede at his deposition that he had no personal knowledge about the prior involvement of any of the three engineers in examinations of competitive products. He said that he had been told this in recent conversations. (Fuji Dep., at 14-23). In fact, as to Mr. Takeyama, Fuji's knowledge was based on multiple hearsay derived from a conversation he had with Mr. Itou. (Fuji Dep., at 23). Unfortunately, his affidavit did not reveal these significant details, which would have borne on the credit to be given to his assertions.

He ultimately had to concede that Mr. Tabuchi had performed inspections of competitors' products before, and he had done so in the context of patent infringement in 2005. (Fuji Dep., at 12, 14). Moreover, Mr. Fuji had no idea what Mr. Tabuchi's job responsibilities were prior to 2005, (Fuji Dep., at 15), so he may well have been performing patent or competitive inspections regularly. In fact, that is precisely what Fujitsu's privilege log revealed. It showed that Mr. Tabuchi worked on patent infringement litigation inspections in January 2001, September 2003, January 2006, March 2006, and June 2006. (Fuji Dep., Ex. 1201, at 1, 4-6, 7-11). The privilege log identified document after document – perhaps 40 or more – that Mr. Tabuchi authored as part of an investigation into patent issues or patent infringement issues.[11]

---

[11] At Mr. Fuji's deposition, Fujitsu's counsel tried to say that "some of [the] dates [of the documents in the log] might be wrong . . . I think some of [the] dates might be wrong. . . [he] could check on it." (Fuji Dep., at 27-29). The position taken by Fujitsu at the deposition does not alter the evidentiary significance of the log. The privilege log has been a part of this case since May of 2009. If the log was wrong it should and would have been amended long before the deposition in February 2012. For Fujitsu's counsel to have guessed that some of the dates "might be wrong" is not a credible position and is not a basis for disavowing entries that now prove disadvantageous to Fujitsu.

Mr. Fuji also said in his affidavit that the results of the 2006 inspection were reported in writing to Mr. Katoh. (*Fujitsu's Reply,* Fuji Aff., ¶ 9). That would lead one to believe that the results were known to the three engineers, Mr. Katoh, and Mr. Fuji. Yet, the night before his deposition, Fujitsu revealed, in an amended privilege log, that the report had two additional, previously unnamed authors, who were also Fujitsu employees. It was also shared with seven additional employees.

In sum, Fujitsu twice presented the court with evidence that it felt sufficient to demonstrate there was good cause for entering a protective order. First, there was Ms. Wright's affidavit; it was inaccurate, insufficient, and misleading. The second affidavit was Mr. Fuji's, which was more expansive, but still inaccurate in key areas. And, oddly, Fujitsu did not attach affidavits from any of the three engineers involved in the inspection, even though the evidence would have been based on personal knowledge and not on guesswork and multiple levels of hearsay as was the case, at least in part, with Ms. Wright and Mr. Fuji. Notably, in the case Fujitsu relies on extensively, the party seeking a protective order produced affidavits from the three engineers who were involved and for whom protection was sought. *In re Shell Oil*, 132 F.R.D. 437, 441 (E.D.La. 1990). *See also Kansas-Nebraska Natural Gas Co. v. Marathon Oil Co.*, 109 F.R.D. 12, 16 (D.Neb. 1984)(finding fault with fact that employees themselves did not testify).

Failure to produce evidence that is uniquely available to one party permits, but does not compel, the inference that the evidence, if produced, would have been unfavorable. *Graves v. United States,* 150 U.S. 118 (1893); *Miksis v. Howard,* 106 F.3d 754, 763 (7th Cir. 1997); *R.R. Donnelley & Sons Co. v. Vanguard Transp. Systems, Inc.*, 641 F.Supp.2d 707, 711 (N.D.Ill. 2009). This is not to draw a negative inference from the fact that Fujitsu refused to make the engineers

14

available for deposition, and I do not do so.  It is simply to recognize that by making the engineers'

testimony unavailable to Tellabs, Fujitsu made it uniquely available to itself, and by not utilizing

that singularly relevant testimony in support of the motion, it triggered the evidentiary principle

adverted to above.  Nor is this to impose a requirement that only non-hearsay can be received in the

context of a proceeding like the one before me.  That is certainly not true.  But the weight to be

given  evidence and the credibility to be afforded witnesses do not cease to be relevant

considerations in the context of disputes involving claims of privilege or applications of Rule

26(b)(4)(D).[12]

Fujitsu cannot be heard to argue that they did not produce the engineers' declarations

because their testimony was privileged.  First, that begs the question to be decided.  But more

importantly, there was nothing privileged about the circumstances under which the inspections came

to be conducted, those to whom the engineers reported the results of the inspection, the form the

report took, what their regular work assignments consisted of,  how they came to be chosen to

perform the inspections, and what they were told regarding the purpose of the inspection, etc. – in

short, the very things Mr. Fuji testified about.  These and other non-privileged areas of inquiry could

have been explored.

## II.
## ANALYSIS

Justice Brandeis once mused that "[s]unlight is said to be  the best of disinfectants . . . ."

---

[12] Vacillations, inconsistencies, and falsehoods are factors that properly may be considered in evaluating a witness's credibility or the story itself may be so internally inconsistent or implausible that a reasonable fact finder would not credit it. *See Anderson v. City of Bessemer,* 470 U.S. 564, 575 (1985) ("Documents or objective evidence may contradict the witness's story."); *Mitondo v. Mukasey,* 523 F.3d 784, 788 (7th Cir.2008); *C.J. Xodus v. Wackenhut Corp.* 619 F.3d 683, 687 (7th Cir.2010); *Kadia v. Gonzales,* 501 F.3d 817, 820 (7th Cir.2007).

Brandeis, Other Peoples Money and How the Bankers Use It (1914). If that's the case, in discovery matters, protective orders are SPF 100. Therefore, a protective order should not be cavalierly granted. Under Rule 26(c), Federal Rules of Civil Procedure, a party seeking a protective order has the burden of showing "good cause." *Jepson, Inc. v. Makita Elec. Works, Ltd.,* 30 F.3d 854, 858 (7th Cir. 1994). To do so, there must be a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements. *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 102 n. 16 (1981). Here, Fujitsu contends that nothing connected to the inspection of the Tellabs optical amplifier in 2006 is discoverable, including the observations of the engineers who conducted the inspection. The argument is based on Fed.R.Civ.P. 26(b)(4)(D), the work product doctrine, and relevancy. As explained below, the arguments are unpersuasive, and Fujitsu has not carried its burden of showing "good cause."

## A.

### Rule 26(b)(4)(D) and the Work Product Doctrine

### 1.

Ordinarily, a party may not "discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial." Fed.R.Civ.P. 26(b)(4)(D). The only exceptions are medical examinations under Rule 35(b) or a showing of "exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means." *Id.* The threshold issue here is easily stated: can an in-house employee be "retained or

specially employed . . . in anticipation of litigation" within the meaning of 26(b)(4)(D)? [13] The

answer to that question has divided the lower courts. The cases are collected in 8A, Wright, Miller,

and Marcus, Federal Practice and Procedure, § 2033 at 124 (2010) and are discussed below.

The Advisory Committee Notes to the 1970 Amendment to Rule 26(b)(4) attempt to offer

guidance:

> Subdivision (b)(4)(B) deals with an expert who has been retained or specially
> employed by the party in anticipation of litigation or preparation for trial (thus
> excluding an expert who is simply a general employee of the party not specially
> employed on the case), but who is not expected to be called as a witness.
>
> *        *        *
>
> Subdivision (b)(4)(B) is concerned only with experts retained or specially consulted
> in relation to trial preparation. Thus the subdivision precludes discovery against
> experts who were informally consulted in preparation for trial, but not retained or
> specially employed.

Fed.R.Civ.P. 26(b)(4)(Advisory Committee Notes). But in the end, the Note is of limited value,

since its attempt at explanation consists mainly of repeating the language of the Rule. *See* James P.

Pielemeier, *Discovery of the Non-Testifying, "In House" Experts Under Federal Rules of Civil*

*Procedure*, 58 Indiana L.J.597, 606 (1983)("the language of the rule and advisory committee note

apparently fail to provide clear guidance on this issue....").

Some courts have simply concluded that the text of the Rule is plain and thus precludes the

conclusion that any employee can ever be "retained or specially employed" in anticipation of

litigation or preparation for trial. *See, e.g.*, *United States v. 22.80 Acres of Land*, 107 F.R.D. 20, 21

(N.D.Cal.1985)("Rule 26(b)(4)(B) was intended to extend protections not to a party's regular

---

[13] Fujitsu has represented in court and in its filings that it will not be calling any one of the three
engineers to testify at trial, and none of their findings will play any role in the reports or testimony of any of
Fujitsu's testifying experts. (*Fujitsu's Motion*, at 5; *Fujitsu's Reply*, at 3).

17

employees, but to outside experts a party retains once that party anticipates litigation or is preparing for trial."); *Matter of Kegg,* 116 F.R.D. 643, 644 (N.D.Ohio 1987)(in-house expert was not the type of impartial observer envisioned by the rule, but more a loyal employee going about his duties); *Virginia Electric & Power Co. v. Sun Shipbuilding,* 68 F.R.D. 397, 407 (E.D.Va.1975); *Kansas-Nebraska Natural Gas Co., Inc. v. Marathon Oil Co.*, 109 F.R.D. 12, 15-16 (D.Neb. 1985)(following analysis of *Virginia Electric*). Generally, these cases have looked to three things to arrive at their interpretation of the Rule: the definition of an expert, the (supposedly) plain language of Rule 26(b)(4), and the accompanying Advisory Committee Notes.

In *22.80 Acres*, for example, the court found the language of the Rule plain and necessitated the conclusion that a company's employees cannot be "retained or specially employed." 107 F.R.D. at 21. The court reasoned that because a company would not ordinarily refer to one of its own employees as "retained or specially employed," the Rule must have been intended to be limited in its application to outside experts. *Id.* It is certainly not an implausible argument – at least as to the "retained" component of the Rule. It would be an odd and unnatural use of language to say that a long-time employee was specially "retained" in anticipation of litigation. And, a narrow view of the word "employ" could (although it need not) exclude assigning an extant employee to do a particular job other than that normally done by the employee.[14]

In *Virginia Electric*, the court held that " though one be an expert, if his contact with the case is not in his capacity as an impartial observer, but is instead as one going about his duties as a loyal employee, then he 'should be treated as an ordinary witness.'" The court looked also to Black's Law

_____

[14] As discussed *infra*, there is not the same semantic awkwardness to say that a long-time employee who is not normally involved in a particular job but is assigned temporarily to another is specially "employed" to perform the task. *See infra* at 21.

18

Dictionary to sustain its exclusionary interpretation, noting that the traditional definition of an expert suggests someone who "owes his allegiance to his calling and not to the party employing him" and "is in a position to testify to testify as an expert and not as a partisan." 68 F.R.D. at 407. It considered whether the Advisory Committee had meant an employee who was specially "assigned" to act as an expert, but felt that interpretation was a stretch giving the ordinary meaning of "expert" being impartial. 68 F.R.D. at 407.

The court concluded that "[t]he distinction between 'retained' and 'specially employed' is the difference between hiring the expert as an independent contractor and hiring him as an employee *pro hac vice*." *Id*. The court felt this was bolstered by Rule 26(b)(4)(D)'s provision for payment to a party of "fees and expenses . . . reasonably incurred in obtaining the expert's facts and opinions." The Advisory Committee Notes interpret this language as allowing for the requirement of compensation to "*the expert* for his time' and to 'compensate *the party* . . . for past expenses . . . incurred . . . ." Thus, the court reasoned, a master-servant relationship between a party and his expert was not contemplated by the Rule. *Id.* The court concluded its analysis by explaining that, if the Advisory Committee had meant "specially assigned," it would have used that term instead of "specially employed." "Taken as a whole," the court held, "the Committee's Notes tend to confirm rather than contradict the court's opinion that the 'in-house expert' is to be treated, for purposes of discovery, as an ordinary witness." *Id.* at 408.

**2.**

Several observations are in order. First, "[i]t may be that no parsing of the rule and [the] Note will afford a fully satisfactory answer to t[he] question" of whether a regular employee of a party should be considered to be "specially employed" within the meaning of Rule 26(b)(4)(D).

19

Wright & Miller § 2033 at 124. But the text and structure of the Rule and the Advisory Committee Note are indeed susceptible of an interpretation that supports a result contrary to those cases that have concluded that in-house experts are not within the scope of the Rule.

 If in-house experts were intended to have been excluded, one would have expected the Rule to have ended with the words "who have been specially retained."  In common parlance, employees already on the job are not  specially *retained,* no matter what the task. The addition of the words, "or specially *employed*," presumably was intended to signal a broader scope. To exclude in-house employees from the ambit of the Rule is effectively to read out the phrase "specially employed." But that would contradict of the basic principle that statutes should be construed to give effect to each word. *See Carcieri v. Salazar,* 555 U.S.379, 391 (2009).

The impression that in-house experts are within the intended scope of the Rule is further bolstered by the phrasing of the Advisory Committee Note, which, immediately after stating that the Rule deals with an expert who has been retained or specially employed by the party in anticipation of litigation or preparation for trial includes the following parenthetical: "(thus excluding an expert who is simply a general employee of the party *not specially employed on the case*)." (Emphasis supplied). If in-house experts were intended to be excluded under the Rule, the Advisory Committee Note would have ended with the words "general employee of the party."  There would have been no need to add the qualifier "not specially employed on the case." Adding that phrase denotes that a  "general employee of the party" is protected if specially employed on the case, but not otherwise. In  short, while the Advisory Committee Note is perhaps not decisive, its explanation goes far to support an interpretation of the Rule that in-house experts are within the ambit of the Rule if specially employed to perform a task in anticipation of litigation.

20

The phrase "specially employed" can mean specially tasked or assigned notwithstanding the conclusion reached by some cases that the words, "assigned" and "employed," cannot be equivalent phrasings. *See Virginia Electric*., *supra*; Webster's College Dictionary and the Oxford English Dictionary define employ as to make use of (someone or something), to use or engage the services, to devote to or direct toward a particular activity, to apply to some definite purpose. Thus, an in-house employee who is directed to perform a particular task that is outside the scope of his normal duties can, consistent with accepted usage, be said properly to have been "specially employed."

Second, the reliance of *Virginia Electric* and other cases on the supposed impartiality of an outside expert, as opposed to the supposed inherent partiality and bias of an employee, seems a questionable basis for a narrow interpretation of Rule 26(b)(4)(D). The premise that an expert is by nature impartial is based on either an incorrect *a priori* assumption that bitter experience has long since proven to be false or a dubious dictionary definition of "expert" as one who possesses not only expertise but impartiality as well. Dictionaries can have a significant role to play in statutory construction. "'But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary....'" *Watt v. Alaska,* 451 U.S. 259, 266 (1981)(quoting, *Cabell v. Markham*, 148 F.2d 737, 739 (2nd Cir.)(L. Hand, J.), *aff'd,* 326 U.S. 404 (1945)).

The drafters of Rule 26(b)(4)(D) surely were aware of the long-standing concern about the partisanship of expert witnesses and thus would not have intended the Rule's meaning to be based on their supposed impartiality. In his famous speech in 1921 to the Bar Association of the City of New York, "The Deficiencies of Trials to Reach the Heart of the Matter," Learned Hand said that the expert "inevitably or nearly, must take on the attitude of a partisan, for partisan they surely become." A year earlier, the Illinois Supreme Court lamented that expert testimony is "regarded as

the most unsatisfactory part of judicial administration ... because the expert is often the hired

partisan ...." *Opp v. Pryor,* 294 Ill. 538, 128 N.E. 580, 583 (1920). And Judge Posner has observed

that experts are often "the mere paid advocates or partisans of those who employ and pay them, as

much so as the attorneys who conduct the suit..." *Olympia Equipment Leasing Co. v. Western Union

Telegraph Co.,* 797 F.2d 370, 382 (7th Cir.1986). This is a view shared by, if not all, the

overwhelming number of judges and evidence scholars.[15]

An interpretation based on an assumption that experience has shown to be untrue is neither

persuasive nor accurate. Even "the plain-meaning rule is 'rather an axiom of experience than a rule

of law, and does not preclude consideration of persuasive evidence if it exists.' *Boston Sand Co. v.

United States*, 278 U.S. 41, 48 (1928) (Holmes, J.)." *Watt,* 451 U.S. at 266.

**3.**

A number of courts have come to a conclusion contrary to that reached by *Virginia Electric*.

*See, e.g., In re Shell Oil Refinery*, 132 F.R.D. 437, 441-42 (E.D.La. 1990)("Which hat

[employees/experts] wear depends on whether their knowledge was gained in the course of their

---

[15] *See e.g.*, Jack Weinstein, *Improving Expert Testimony,* 20 U.Rich.L.Rev. 473, 482 (1986)("an expert can be found to testify to the truth to almost any factual theory, no matter how frivolous."); Michael H. Graham, *Expert Witness Testimony and the Federal Rules of Evidence: Insuring Assurance of Trustworthiness* (1986) Ill.L.Rev. 43, 45; 29 ("Today practicing lawyers can locate quickly and easily an expert witness to advocate nearly anything the lawyers desire."); 29 Wright and Gold, Federal Practice and Procedure, 6262 at 183 (1997); Huber, *Safety and the Second Best: The Hazards of Public Risk Management in the Courts,* 85 Colum.L.Rev. 277, 333 (1985) ("A Ph.D. can be found to swear to almost any expert proposition no matter how false or foolish."); *Miller v. Lenz* 2010 WL 252287, 2 (N.D.Ill.2010); *Discovery of the Non-Testifying, "In House" Experts Under Federal Rules of Civil Procedure*, *supra*, 58 Indiana L.J. at 606, 626 ("'the question attorneys implicitly ask in evaluating the potential expert testimony of each party is, to paraphrase, whether my whore" ' will be more persuasive than your whore.'"). *See also Minasian v. Standard Chartered Bank, PLC,* 109 F.3d 1212, 1216 (7th Cir. 1997); *Rosen v. CibaGeigy Corp.,* 78 F.3d 316, 319 (7th Cir. 1996).

special employment as members of the investigation team or in the course of their regular duties."); *Marine Petroleum Co. v. Champlin Petroleum Co.*, 641 F.2d 984, 993 (D.C.Cir. 1979)("The rule's tacit acknowledgement of the necessity of meticulous preparation has equal force whether the expert is one originally and exclusively retained for anticipated litigation or one whose employment responsibilities are expanded to encompass consultation and advice in expectation of litigation."); *Seiffer v. Topsy's Intern., Inc.*, 69 F.R.D. 69, 72 (D.Kan.1975)(where partner in defendant accounting firm was requested by law firm to assist in possible litigation arising out of accounting firm's audits by reviewing the work, had not been involved in the audits, and reported his findings in writing to the law firm, he was not merely a "general employee"); *In re Sinking of Barge Ranger I Cas. Near Galveston, Tex. on May 10, 1979*, 92 F.R.D. 486, 489 n.5 (S.D.Tex. 1981)(following *Sieffer*).[16]

Of the cases finding that a regular employee can be deemed an in-house expert immune from discovery, perhaps the most extensive analysis is that in *Shell Oil*.[17] In *Shell Oil*, there was a refinery explosion and, in its wake, the oil company had employees conduct metallurgical tests. At least two of those employees were experts in that field, and the oil company sought to protect their findings from discovery, contending they were "specially employed." The court first determined that in-house experts came under the Rule's protection:

---

[16] In its motion, Fujitsu relies on *Shell Oil* and two other cases that have nothing to do with the situation here, *Plymovent Corp. v. Air Technology Solutions, Inc.*, 243 F.R.D. 139 (D.N.J 2007) and *Moore U.S.A. Inc. v. Standard Register Co.*, 206 F.R.D. 72(W.D.N.Y. 2001). (*Fujitsu's Motion*, at 9). Both cases involved the retention of independent, outside testing labs. *Plymovent*, 243 F.R.D. at 141; *Moore*, 206 F.R.D. at 73. Such cases do not offer guidance about experts who are in-house employees assigned a certain task. Moreover, Fujitsu's motion would lead one to conclude, incorrectly, that there is not case law at odds with its position.

[17] The *Shell Oil* court revisited this issue in *In re Shell Oil*, 134 F.R.D. 148 (E.D.La. 1990), and simply harkened back to its earlier ruling.

> To rule otherwise would encourage economic waste by requiring an employer to hire independent experts to obtain the protection of Rule 26(b)(4). Protection of an in-house expert's opinion's supports improved public safety and other social benefits of self-analysis. That the work of an in-house expert is used not only to defend a lawsuit but also to improve a company's operations or product design does not remove him from the parameters of Rule 26(b)(4)[(D)].

*Shell Oil*, 132 F.R.D. at 441(citation omitted).

The opinion went on to note the split in authority on whether a regular employee could ever be considered "specially employed", but did not discuss the case law. The court sided with the cases answering that question "yes" and then considered whether the two employees involved in the case qualified as having been "specially employed." *Id*. at 442. Among the factors informing the court's determination were:

> Shell's attorneys engaged Nordstrom and Nelson to perform specific tasks to help them defend the lawsuit. At the direction of Shell's legal department and outside counsel, Nordstrom and Nelson investigated and studied the cause of the explosion, and prepared preliminary reports. Copies of the reports were sent only to Shell's outside counsel. Although Nordstrom and Nelson might have studied the cause of the explosion regardless of litigation, their usual duties do not include litigation assistance. That Nordstrom and Nelson were not paid additional compensation or assigned exclusively to the litigation is not conclusive. An in-house expert may be specially employed without additional compensation or an exclusive assignment.

*Id.*

What all the cases agree on is that the expert must be "specially employed in anticipation of litigation." The question is whether the special employment must be on a project other than the kind the employee normally is engaged in as well as being in anticipation of litigation or whether the special employment is on a matter in anticipation of litigation. The Rule is susceptible of being read as requiring both. In that event, the rule would not be operative unless it could be shown that the employee was given a project that he wouldn't ordinarily be working on. If that interpretation is

24

correct, Fujitsu has only questionable evidence to show that the three engineers were specially assigned in this case. At least two of the engineers – Mr. Itou and Mr. Tabuchi – were not. It was, at the very least, contemplated that Mr. Itou would be involved in a business-related, as opposed to infringement-related, examination of Tellabs' optical amplifier. Why else include him on the urgent October 2005 e-mail? Mr. Tabuchi had done several infringement-related inspections of Tellabs' and other companies' products. Perhaps most significantly, the fact that Ms. Wright's and Mr. Fuji's affidavits were later undermined by their deposition testimony, coupled with the fact that Fujitsu has offered nothing from the three engineers at issue, calls into question Fujitsu's argument that the engineers fall under Rule 26(b)(4)(D)'s "specially employed" category of in-house experts.

As it turns out, however, there is no need to answer this question definitively because, in any case, the plain language of the Rule requires that the special employment be " in anticipation of litigation." And Fujitsu has failed to meet its burden of demonstrating that was the case. The phrase "in anticipation of litigation" is well known as a prerequisite to work product protection. *See* Fed.R.Civ.P. 26(b)(3); *United States v. Nobles*, 422 U.S. 225, 238 (1975); *Hickman v. Taylor*, 329 U.S. 495, 508 (1947). The issue has always been, whether the preparation of a document – or, here, undertaking of and reporting on an inspection of products – was done in anticipation of litigation or in the ordinary course of business.

We begin with the basics. Like all fact-dependent issues, it is often a difficult thing to determine with precision whether something was done in anticipation of litigation. *Binks Mfg. Co. v. National Presto Industries, Inc.*, 709 F.2d 1109, 1120 (7th Cir. 1983). Merely because litigation eventually ensues does not, by itself, cloak materials with work product protection. *Id.,* at 1118. Rather, we look to whether in light of the factual context the document can fairly be said to have

25

been prepared *because* of the prospect of litigation. *Logan v. Commercial Union Ins. Co.,* 96 F.3d 971, 976-977 (7th Cir.1996). But the prospect of litigation cannot be one that is merely possible. All things are possible. Rather "[i]t is important to distinguish between an investigative report developed in the ordinary course of business as a precaution for the '*remote prospect of litigation*' and materials prepared because 'some *articulable* claim, *likely* to lead to litigation ... ha[s] arisen.'" *Id*. at 977 (Emphasis supplied)(bracket in original). The former will not suffice to trigger the protections of the Rule. *See Sandra T.E.*, 600 F.3d at 621-622. The party seeking to assert the work product protection has the burden of proving facts supporting the conclusion that "'at the very least some articulable claim, likely to lead to litigation, [had] arisen.'" *Binks Mfg. Co.,* 709 F.2d at 1119. Fujitsu's proof fails conspicuously in this regard.

The only thing that is clear from the evidence is that Fujitsu was in significant competitive straits following the award of the Verizon contract and was consumed with the competitive business need to examine the Tellabs optical amplifier, whose technology Verizon had concluded was far superior to Fujitsu's. There is absolutely nothing in the evidence submitted by Fujitsu that could remotely support the conclusion that in 2006, there was any colorable or articulable claim that Fujitsu had against Tellabs for violation of Fujitsu's patents. Indeed, there was not even a remote prospect of litigation. Indeed, even Ms. Wright's affidavit merely says that the investigation she claims she spearheaded was to "investigate the *possibility* that products sold by the Tellabs defendants infringed one or more patents owned by Fujitsu." *See supra,* at 5 (emphasis supplied). In fact, the word "possibility" is repeated over and over in her affidavit. *See supra,* at 5-7.

Even if one were to credit at face value Fujitsu's supporting affidavits – which I do not – it cannot be said that Fujitsu has shown that its inspection of the Tellabs' optical amplifier was "in

26

anticipation of litigation" as that phrase is used in Rule 26(b)(4)(D) and in the context of work-product protection.

Moreover, "[w]hile litigation need not be imminent, the *primary motivating purpose* behind the creation of a document or investigative report must be to aid in possible future litigation." *Binks Mfg. Co.,* 709 F.2d at 1119 (emphasis supplied). As already discussed, the evidence is convincing that the plan to inspect Tellabs' products was born out of a concern that Tellabs had breezed by Fujitsu on the technology trail. Fujitsu was smarting from having lost the Verizon deal – a deal it thought it had in the bag – to Tellabs and was deeply concerned that its technology had been eclipsed by Tellabs. Judging by the email traffic, Tellabs came out of nowhere and Fujitsu was broadsided. As Fujitsu's internal documents revealed, it knew nothing at all about Tellabs. Thus, the purchase and examination of Tellabs' equipment was the only way Fujitsu felt it could conduct the competitive vivisection deemed indispensable to its ability to contend with Tellabs.

The questions posed, in substance, by the October 2005 email regarding Tellabs' technological superiority were, "how did Tellabs get so far ahead of us" and "how do we catch up"? The question raised on the present record is how those inquiries became, just a few months later, "has Tellabs infringed our patents?" One can look long and hard at Fujitsu's submissions and not find the answer. In fact, Fujitsu consigns its "explanation" regarding that significant question to a brief, conclusory and ultimately unsupportable footnote.[18] Fujitsu claims that there were two completely separate tests – one for competitive reasons and one for patent infringement reasons:

> Tellabs attempts to conflate the 2006 inspection performed by Fujitsu Limited for infringement analysis for patent enforcement purposes with a wholly separate investigation performed by FNC relating to the competitive analysis of Tellabs

---

[18] If that question cannot be satisfactorily answered, Fujitsu's claim that the inspection was really done to determine patent violations and not for competitive purposes has a terribly hollow ring.

products following Tellabs' successful bid with Verizon in August 2005. In reality, there were two separate groups with two separate goals. Despite Tellabs' conclusory allegations that attempt to merge the two separate projects, there simply was no overlap between Fujitsu's infringement investigation into Tellabs products and Fujitsu's Verizon bid "post-mortem". The deposition testimony of Ted Van Ryn, manager of market intelligence at FNC, confirmed that the investigations were separate and that no information about the Tellabs optical amplifier modules purchased and inspected in 2006 was shared with the competitive intelligence group. (*See*, Exhibit 1, *Van Ryn Dep Tr.*, pp. 9:13-12:7; 64:13-19; 87:3-90:11; 92:7-20; 100:2-17 and 285:3-287:14; *see also*, Exhibit 2, *Wright Depo Tr.*, pp. 14:23-16:14 and 61:18-25.)

(*Fujitsu's Reply*, at 6 n. 3).

The portions of Van Ryn's deposition that Fujitsu cites say nothing at all about a second, separate inspection. Instead, in the cited pages, Mr. Van Ryn talks about his duties with FNC, the fact that FNC and Fujitsu are two different companies (*Van Ryn Dep. Tr.*, at 9:13-12:7); that he did not know the engineers who performed the inspection (*Id.*, at 64:13-19); how the shipment of Tellabs equipment was handled (*id.*, at 87:3-90:11); that he did not know to whom at Fujitsu the equipment was shipped (*id.*, at 92:7-20); that he didn't recall having any conversations about buying the equipment with anyone but a lawyer (*id.*, at 100:2-17); and a reference to a document addressed to what Mr. Van Ryn calls a DWDM planning team and his understanding that they did not get any competitive data from the Tellabs products because "they never looked at them." (*id.*, at 285:3-287:14).

Fujitsu has not included what it seems to feel are the pertinent pages of the document with its reply, even though judges may not be asked "to play archaeologist with the record." *DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir.1999). Obviously, none of the cited testimony says anything about there being two separate tests. If anything, the cryptic reference to some unknown document and a DWDM team – whatever that may be – suggests that there weren't two tests because Mr. Van

Ryn said the DWDM team didn't bother to conduct one. But why would (and how could) that be? It will be recalled that in October 2005 Fujitsu was making desperate pleas to Van Ryn to procure a Tellabs amplifier on the open market – which he faithfully did in 2006. And now the claim apparently is that the Tellabs' amplifier Van Ryn purchased was really obtained for Ms. Wright's project to determine whether there might be patent violations by Tellabs. That version of events seems improbable. But even if Fujitsu's version is to be credited, the present motion cannot be decided in Fujitsu's favor since the inspection was not in anticipation of litigation and the primary impetus was commercial not legal.

The cited portions of Ms. Wright's testimony are no help to Fujitsu either. There, Ms. Wright talks about: working with FNC's marketing department leading into the infringement investigation and some members of Fujitsu's law and intellectual property group (*Wright Dep.*, at 14:23-16:14); and that she had no knowledge that Mr. Itou was looking at the Tellabs equipment for any purpose other than the infringement investigation. (*Id.*, at 61:18-25). Ms. Wright also testified that she didn't recall if she was aware of Fujitsu's request to buy Tellabs' equipment in 2005. (*Id.*, at 60-61). Again, Ms. Wright does not testify that there were two separate inspections, one for legal reason and one for business reasons.

She does, however, talk a bit about Mr. Itou. Mr. Itou is significant because he was involved to some degree in the discussions about the urgent need to inspect Tellabs' optical amplifier in the wake of the award of the Verizon contract to Tellabs. Now, Fujitsu claims there were two separate inspections involving two separate teams. If there were, in fact, two separate investigations – and Fujitsu has offered no convincing evidence that there were truly separate endeavors motivated by separate concerns – it is inaccurate to say there were two separate teams, with different personnel.

29

The teams were not so separate that Mr. Itou wasn't thought necessary to both of them. And that duality is fatal to the claim of confidentiality being advanced by Fujitsu. Mr. Itou simply cannot simultaneously be a general employee tasked to inspect Tellabs amplifiers for competitive reasons and an expert specially employed to inspect the same amplifiers "in anticipation of litigation" and successfully contend that the latter efforts are immune from discovery.

In sum, the record shows that the impetus for the inspection was commercial, not legal. It may have later morphed into something in addition – if Fujitsu's affidavits are taken at face value which, I do not – but it can't be said that the *primary* motivating purpose was imminent litigation. *See In re Google Inc*., 2012 WL 371913, *3 (Fed.Cir. 2012)(original email initiating the project that did not evince any need for infringement analysis showed that project was born of commercial concerns rather than legal ones).

Rather than offering definitive proof of an early inspection done for infringement analysis designed to deal with an articulable concern about litigation with Tellabs and unrelated to analysis for competitive for business purposes, Fujitsu's evidence has left the matter, *at best*, in a state of ambiguity. Since "any ambiguity as to the role played by the expert when reviewing or generating documents should be resolved in favor of the party seeking discovery," *B.C.F. Oil Refining, Inc. v. Consolidated Edison Co. of New York, Inc*., 171 F.R.D. 57, 62 (S.D.N.Y. 1997); *accord, Sara Lee Corp. v. Kraft Foods Inc*., 273 F.R.D. 416, 420 (N.D.Ill. 2011), it loses on this point. *Compare, In re Commercial Money Center, Inc., Equipment Lease Litigation,* 248 F.R.D. 532, 538 (N.D.Ohio 2008)("'any ambiguity as to the role played by the expert when reviewing or generating documents should be resolved in favor of the party seeking discovery.'").

30

This result is dictated not only by the rule that a party cannot sustain its burden under Rule 26(b)(4)(D) with equivocal evidence, but also by the broader principle that "[e]videntiary privileges in litigation are not favored." *Herbert v. Lando,* 441 U.S. 153, 175 (1979). Statutes establishing evidentiary privileges or their equivalent must be construed narrowly because they impede the search for the truth. *Pierce County, Wash. v. Guillen,* 537 U.S. 129, 144-145 (2003);*University of Pennsylvania v. EEOC*, 493 U.S. 182, 189 (1990); *Baldrige v. Shapiro,* 455 U.S. 345, 360 (1982). This, of course, includes information whose production is resisted on work product grounds. *See Ross v. City of Memphis,* 423 F.3d 596, 600 (6th Cir.2005); *Holmes v. Pension Plan of Bethlehem Steel Corp.,* 213 F.3d 124, 138 (3d Cir.2001); *Hawkins v. Stables,* 148 F.3d 379, 383 (4th Cir.1998); *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1429 (3d Cir.1991); *Howell v. City of New York,* 2007 WL 2815738, 1 (E.D.N.Y. 2007).

## B.

### The Relevance of the Requested Information

Fujitsu's final argument is the information is irrelevant under Rule 26. That is a difficult argument on which to prevail. Consistent with the overall inclusive and liberal design of the Federal Rules of Evidence, the federal courts are unanimous in holding that the definition of relevant in Rule 401 is expansive and inclusive, *Sprint/United Management Co. v. Mendelsohn,* 552 U.S. 379, 387–388 (2008), and that the standard for admissibility is very low. *United States v. Needham,* 377 Fed.Appx. 84, 85–86 (2nd Cir.2010); *United States v. Murzyn,* 631 F.2d 525, 529 (7th Cir.1980). Thus, to satisfy the requirement of Rule 401, the evidence need not be conclusive on a given point or have great probative weight. As Professor McCormick phrased it, "a brick is not a wall." It is enough that the evidence has "any tendency to make the existence of any fact that is of consequence

to the determination of the action more or less probable than it would be without the evidence."

Rule 401. *See generally Sprint/United Management Co.,,* 552 U.S. at 387–388; *Daubert v. Merrell*

*Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 587 (1993); *Huddleston v. United States,* 485 U.S. 681,

691 (1988); 1 J. Weinstein & M. Berger, *Weinstein's Federal Evidence* § 401.04[2][b].

Relevance for purposes of discovery is even less rigorous. *Eggleston v. Chicago Journeymen*

*Plumbers' Local Union No. 130, U. A.*, 657 F.2d 890, 903 (7th Cir. 1981); *Kelley v. Board of*

*Education, City of Chicago*, 2012 WL 1108135 (N.D.Ill.2012). Rule 26(b)(1) allows for discovery

"regarding any nonprivileged matter that is relevant to any party's claim or defense . . . ." The

evidence "need not be admissible at the trial if the discovery appears reasonably calculated to lead

to the discovery of admissible evidence." Rule. 26(b)(1).

Fujitsu's argument that the evidence being sought is not relevant puts out of view these basic

principles and instead tacitly assumes its announced decision not to use or rely on any aspect of the

inspection at trial makes the evidence irrelevant. (*Fujitsu's Motion*, at 5). But a party's decision not

to use evidence obviously has nothing to do with whether the evidence is relevant either for purpose

of discovery or admissibility at trial. The only question under Rule 401 is whether the evidence

might tend prove or disprove a fact of consequence in the case. [19] And the only question under Rule

26 is whether discovery will lead to such evidence.

Fujitsu's second argument does not fare any better. It complains that, at the time of the 2006

inspection, its engineers only had access to information about the Tellabs equipment that was in the

public domain. Since then, Fujitsu has gained more information about the Tellabs products through

---

[19] Suppose a party sends an inculpatory letter that ultimately is unearthed by an adversary in litigation and that substantially undermines the author's claim. It could scarcely be suggested that the evidence is not relevant either under Rule 26 or Rule 401 because the author obviously will not use the inculpatory document.

discovery. Fujitsu adds that the 2006 inspection was conducted without the benefit of a *Markman* ruling on the claims of the patents-in-suit. For Fujitsu, "[t]he results and conclusions of the 2006 . . .inspection[] are thus outdated and irrelevant to any issue that will be presented to the jury." (*Fujitsu's Motion*, at 6). Perhaps what has occurred might have persuaded Fujitsu not to use the evidence. That does not mean it is necessarily irrelevant to a claim or defense by Tellabs.

All versions of Fujitsu's optical amplifier equipment sold since 2003 practice Fujitsu's Patents Nos. 737; 163; and 418. (*Tellabs' Response*, Ex. K). It seems a curious idea that Tellabs would infringe on patents that went into a product that Fujitsu itself called "so weak compared to other products." (*Tellabs' Response*, Ex. E). One of the issues in this case is whether Tellabs copied – or had any need to copy – Fujitsu's patents. Fujitsu's inspection in 2006 of Tellabs' optical amplifier would certainly appear to be relevant to that issue under the expansive provisions of Rule 26(b).

Finally, Fujitsu contends that the Tellabs equipment that was the subject of the inspection is now obsolete, and Fujitsu has targeted newer Tellabs' device with its infringement allegations. But, at the oral argument, Tellabs explained that the new products incorporate technology included in the inspected products, and that, for what ever reason, Fujitsu radically changed its original position – which was that the inspected Tellabs products did infringe – from the time they filed suit until 2011. Fujitsu seemed to think that the new products did not incorporate enough of the former technology, but for the purposes of relevance under Rule 26(b), that's parsing things a bit too finely and the evidence, in any event, does not sustain the contention. Tellabs also says the information being sought is relevant because of "value" and motive for filing suit. All in all, on the present record, there has been a sufficient showing of relevance.

**CONCLUSION**

Fujitsu has not shown good cause for entry of the requested protected order and its Motion

for Protective Order [#330] is therefore denied.

DATE: 5/1/12                    ENTERED: _____
                                         UNITED STATES MAGISTRATE JUDGE