**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TELLABS OPERATIONS, INC. | ) | |
| | ) | **No. 08 C 3379** |
| Plaintiff, | ) | |
| | ) | **No. 09 C 4530** |
| v. | ) | |
| | ) | |
| FUJITSU LIMITED AND FUJITSU | ) | **Chief Judge James Holderman** |
| NETWORK COMMUNICATIONS, INC., | ) | |
| | ) | **Magistrate Judge Jeffrey Cole** |
| Defendants. | ) | |
| _____ | ) | |
| FUJITSU LIMITED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| TELLABS OPERATIONS, INC, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.**

**INTRODUCTION AND FACTUAL BACKGROUND**

In 2006, Fujitsu conducted an extensive inspection of a Tellabs optical scanner purchased

on eBay along with confidential manuals that accompanied the scanner.[1] Almost from the beginning,

the contents and results of that inspection have been the source of a heated and continuing dispute,

with Tellabs contending that it was entitled to the documents prepared in connection with that

_____

[1] It is undisputed that three Tellabs modules were inspected by Fujitsu's engineers in Japan. The technical designation for one of them was Metropolitan Impact Amplifier Module ("MIAM") P/N 81.61232. See Tellabs' Brief Regarding Dr. Willner's Consideration Of Fujitsu's July 28th Infringement Contentions, Attachment A, Exhibit 3 [852] ("Tellabs' Brief"). *See also* Transcript of evidentiary hearing of August 17, 2012. (Tr. 107-110, 120-123, 131). "Tr."refers to the transcript of that hearing.

inspection by Fujitsu's engineers, and Fujitsu adamantly resisting production. The somewhat complicated but singularly important background of the dispute is told in the extensive Memorandum Opinion and Order of April 1, 2012. [#647]. *See Tellabs Operations, Inc. v. Fujitsu Ltd.*, 2012 WL 1520333 (N.D.Ill. 2012).

In brief, the Memorandum Opinion concluded that the 2006 inspection was done for competitive and economic reasons, that Fujitsu was simply responding to its loss to Tellabs of an extraordinarily lucrative contract from Verizon, and that "the inspection was not in anticipation of litigation and the primary impetus was commercial not legal." The opinion also rejected the claim that there were two separate inspections, one animated by commercial concerns, the other in anticipation of litigation. The opinion also rejected Fujitsu's argument that the results of the 2006 inspection were irrelevant because Fujitsu represented that the results and conclusions of the 2006 inspection were outdated, and that it would not make any use of any aspect of the inspection at trial. Nor would it allow its expert ever to be exposed to those results. *See Tellabs Operations, Inc.*, 2012 WL 1520333, 16-18. These representations, which have been repeated over and over in varying forms, will, as we shall see, assume significant dimensions in the resolution of the current controversy.

Fujitsu was ordered to turn over the results of the 2006 inspection, and its motion for a protective order was denied. *Tellabs Operations, Inc.*, 2012 WL 1520333, 19. Fujitsu informed the court that while it disagreed with the Opinion, after careful deliberation, it had decided not to file objections to it with Chief Judge Holderman. [# 623]. Consequently, Fujitsu has waived any objection it might have had to the Opinion either in the district court or in the Seventh Circuit in the event of an appeal following the entry of final judgment. *See Schur v. L.A. Weight Loss Centers, Inc.*,

577 F.3d 752, 760 (7th Cir.2009); *Egan v. Freedom Bank,* 659 F.3d 639, 644 (7th Cir.2011);

*DirecTV, Inc. v. Barczewski,* 604 F.3d 1004, 1011 (7th Cir.2010); *Banco Del Atlantico, S.A. v. Woods*

*Industries Inc.,* 519 F.3d 350, 354 (7th Cir.2008).[2]

Rather than turnover the 2006 inspection assessment of the engineers in Japan, Fujitsu took

the position that those results were protected by the attorney-client privilege and claimed that it had

appropriately raised that argument in its motion for protective order. Tellabs disagreed, contending

that argument had been waived, and the parties briefed the issue. Meanwhile, in March and again in

April 2012, Dr. Alan Willner, Fujitsu's expert, issued his expert reports on infringement and validity.[3]

In both those reports, issued one month apart, he explicitly stated that he "reviewed and considered"

Fujitsu's 2008 infringement contentions – which relied on or incorporated or utilized the 2006

inspection. Fujitsu had represented repeatedly to the court that those contentions would never be

provided to Dr. Willner, and that if they were to be considered by him, production of the 2006

inspection materials would be required.

Tellabs then took the depositions of Dr. Willner and one of the Fujitsu lawyers who

participated in the preparation and review of those sections of the reports listing  the materials that

Dr. Willner "reviewed and considered" in formulating his opinions.  Tellabs also deposed other of

Fujitsu's lawyers who had reviewed those reports.  Each claimed that it was all a mistake, and that

---

[2] *See also Thomas v. Arn,* 474 U.S. 140, 147 (1985); *Smith v. School Bd. of Orange County,* 487 F.3d 1361, 1365 (11th Cir.2007); *Zinna v. Cook,* 428 Fed.Appx. 838, 841 (10th Cir.2011); *Reddick v. White,* 456 Fed.Appx. 191, 193–194 (4th Cir.2011); *Lee v. Plantation of Louisiana LLC,* 454 Fed.Appx. 358, 359 (5th Cir.2011); *Spencer v. Beard,* 351 Fed.Appx. 589, 590–91 (3rd Cir.2009);*Wells Fargo Bank, N.A. v. Carnago,* 2012 WL 1205666, 3 (E.D.Mich.2012)(collecting cases); *Muegge v. Heritage Oaks Golf and Country Club, Inc.,* 209 Fed.Appx. 936, 939 (11th Cir.2006); *Garland v. Malinich,* 181 Fed.Appx. 276, 278 (3rd Cir.2006).

[3] Dr. Willner is a professor at the University of Southern California, where he teaches electrical engineering, optical communications.  (Tr. 14).

Dr. Willner had in fact never even seen the 2008 contentions, although it was conceded that they had been sent to him in December 2010 following the *Markman* hearing.

Dr. Willner testified at his deposition that he did not even realize that the contentions had been sent to him, and that while he had opened the FedEx envelope containing the contentions, he did not realize what they were and never looked at them. Instead, he said, they were among a several inch thick stack of documents that he took from the FedEx envelope and placed loosely on his office floor, where they sat for more than two years unreviewed and unexamined. It was not until quite recently when one of Fujitsu's lawyers asked him to search his office to ascertain whether he had the 2008 infringement contentions that he realized they had been on his floor all along. (Tr. 15-19).

Mr. Gino Cheng, the lawyer at Orrick, Harrington & Sutcliffe in California, which is one of the Firms representing Fujitsu, participated in and oversaw the preparation of the sections of Dr. Willner's two expert reports that carefully itemized the materials Dr. Willner certified he "reviewed and considered" in forming his opinions. He claimed that he had made a mistake in twice including Fujitsu's July 2008 contentions in that list, and that Dr. Willner could not have seen those disclosures since they had never been sent to him for review. (Tr. 80, *et seq.*).

Tellabs, understandably taken aback, took the position these representations were false and that Dr. Willner's unqualified assertions in his expert reports were accurate and that Tellabs was therefore entitled to the 2006 inspection reports since Fujitsu's 2008 infringement contentions had relied on or utilized in some fashion the 2006 inspection. Tellabs then filed an extensive evidentiary presentation with this court, and Fujitsu responded with affidavits and portions of deposition transcripts purporting to support its position that the whole thing was an unfortunate mistake. It was obvious that the matter could not be decided on the conflicting depositions and that an evidentiary

4

hearing was necessary. *Cf., Tranzact Technologies Inc. v. 1Worldsite*, 406 F3d 851, 855 (7th Cir. 2005); *1SourceUnited States v. Berg ,* 20 F.3d 304, 311 (7th Cir. 1994).

## II.
## THE EVIDENCE ADDUCED AT THE HEARING

### A.
### The Testimony of Dr. Alan Willner

By at least June 2011, if not earlier, Fujitsu had decided that it was imperative that nothing related to Fujitsu's 2006 inspection of the Tellabs modules should be conveyed to its expert, Dr. Willner. Mr. James Brooks, a senior member of the Fujitsu legal team at the Orrick Firm, repeatedly represented on the record to this court that Dr. Willner would be insulated from the 2008 infringement contentions, and that if he were exposed to them, Tellabs would indeed be entitled to disclosure of the inspection results. Mr. Brooks' representations may be found in Tellabs's Brief Regarding Dr. Willner's Consideration of Fujitsu's July 2008 Infringement Contentions, Attachment A. [#852]. To isolate Dr. Willner from the 2008 invalidity contentions, Mr. Brooks "gave the directive [to the three or four younger lawyers working under him on the preparation of Dr. Willner's expert reports] to make sure [they] insulated Dr. Willner from the 2008 contentions." (Testimony of Gino Cheng, Tr. 165). Indeed, that directive was discussed "multiple times." (*Id.*). *See* also Tellabs' Brief, Exhibit17 at7 *et seq*, Brooks deposition testimony).

During his testimony at the hearing, Dr. Willner conceded that the 2008 invalidity contentions were actually sent to him by Fujitsu in December 2010 following the *Markman* hearing. However, he claimed he never actually saw or reviewed them. (Tr. 48-50, 54, 61-63). Instead, believing that they were his own materials that Fujitsu's lawyers' administrative staff had FedEx'd to him so that he would not have to carry them on the airplane from Chicago to California after the *Markman*

hearing, he merely opened the FedEx package, "took out the things, and dumped it on the floor." He

said there was no cover letter, and he guessed that he "didn't even think to look at it." (Tr. 57). The

materials sat on the floor of his office, where he said they lay unreviewed and undisturbed until a few

months ago, when Mr. Brooks asked him to search his office to see if he had the 2008 contentions.

It was only then that he realized he had them all along. (Tr. 15-19, 54-57, 61-64).

Dr. Willner said that he was "surprised to see that there was a document that had on the front

of it something from Tyler, Texas" that appeared to be what Mr. Brooks had asked him to look for.

But he didn't even look at it; he just "picked it up with my hand and brought it right to" Fujitsu's

lawyers in California. (Tr. 19). He said that he didn't even go past the first page "because at that

point it was clear to me this isn't something I am even supposed to look at, so I didn't even bother."

(Tr. 20). He did not explain why when following the *Markman* hearing, he got a second FedEx

package, again with no cover letter, that presumably contained the *Markman* materials he did not

realize that the four or five-inch thick "stack" of papers he had placed on the floor was not what he

mistakenly thought it was. (Tr. 56, 61-62). Nor did he claim he deposited those documents on the

floor with the other materials from the first FedEx package.

Dr. Willner testified that the statements in his reports that he "reviewed and considered" the

July 2008 infringement contentions were simply mistaken. (Tr. 18-22, 29-30, 172). He was sure

that certain other references to materials he had "reviewed and considered" were also mistaken, but

he could not say which ones in fact he had not reviewed. (Tr. 29-33, 47-50). The only ones he was

absolutely certain he had not reviewed were the July 2008 infringement contentions. (Tr. 45). He

admitted reviewing Fujitsu's 2011 contentions in which he said the July 2008 contentions are referred

6

to. (Tr. 36-37).[4] And, significantly, while he said he hadn't seen and reviewed the 2008 contentions, he testified that he believed the 2008 contentions were exhibits to his expert reports, although he wasn't sure, and he said he didn't see all the attachments. (Tr. 47-48). Dr. Willner was quite emphatic that of course he believed that at the time he signed his March and April 2012 reports they were true and accurate. (Tr. 47).

Dr. Willner had been an expert in two prior cases and had prepared reports in both. Neither were patent cases, and he understood the need for "even greater care in this case" than in those. (Tr. 24-26). Yet, despite that awareness, and despite the fact that the first sentence of ¶34 of his March report and ¶ 31 of his April report stated: "I have reviewed and considered Fujitsu's July 28, 2008 Rule 3-1 disclosures and attached exhibits (e.g., for the '163 and '737 Patents)," he insisted that his representations were honest mistakes and that he had not reviewed the 2008 contentions.[5] *See* Fujitsu Brief, Exhibit 9 at 5; Exhibit 10 at 5 [#852-10, 852-11]).

Ultimately, Dr. Willner claimed that he relied on the "accuracy of the list of documents" that he had been given by Fujitsu's lawyers. (Tr. 64). He said that while in his reports he represented that he had "reviewed had considered" the documents listed in ¶¶ 31 and 24 of his reports, he "really didn't know...what [he was] representing [as true] was partially inaccurate...." (Tr. 64). Dr. Willner attempted to suggest that the sections captioned "Materials considered" were somewhat peripheral, and that his focus was largely on more "substantive" provisions of the report. (Tr. 33).

But, Dr. Willner testified both at his deposition and at the hearing that he had spent "many

_____

[4] *See also* discussion at Tr. 118-122.

[5] It was conceded at the hearing that Fujitsu's July 28, 2008 Rule 3-1 Disclosures were the July 28, 2008 infringement contentions. (Tr. 82).

hours" in his "multiple reviews" of his expert reports to ensure accuracy prior to signing them. (Tr. 39; 37, 43-44; *see* Tellabs' Brief, Exhibit 16, at 36) [#852]).  In fact, Gino Cheng, Fujitsu's lawyer at Orrick, who oversaw the preparation of the reports and the compilation of the materials that went along with them, testified at his deposition that Dr. Willner reviewed his reports multiple times in various states of completion (*id*., Exhibit 18, at 18-19), but never requested any changes to the sections of his report identifying the materials he considered (*id*. at 17). Nor did Mr. Cheng, despite his "multiple" reviews and those of others of his colleagues, including Mr. Brooks. (Tellabs' Brief, Ex 17 at16).

Like Dr. Willner, Fujitsu's brief seeks to minimize the force and importance of Dr. Willner's certifications in his reports about what he "reviewed and considered" by noting that the statements were not under oath – what significance that could have the brief does not say – that only "minimal time"was spent on reviewing the "Materials considered" sections of the reports, and that more time was spent on other portions of the reports.   This is an unconvincing argument.

First, what "minimal" means in this context is not explained, and unsupported conclusory statements by lawyers in briefs don't count. *IFC Credit Corp. v. Aliano Brothers General Contractors, Inc*., 437 F.3d 606, 610-611 (7th Cir. 2006); *United States ex rel. Feingold v. AdminaStar Federal, Inc*., 324 F.3d 492, 494, 497 (7th Cir. 2003).  Second, the fact that more time may have been spent on other sections of the reports than was spent on the"Materials considered" sections  tells us nothing about how much time was spent on either.  Yet, without that quantification the inference  Fujitsu draw is not a reasonable or persuasive one.

Second, Fujitsu's attempt to minimize the importance of the "Materials considered" sections

of Dr. Willner's expert reports ignores the structure of those reports and of Rule 26(a)(2)(B)(ii). Since the section of the reports entitled "Materials considered," appears under the heading "Bases of Opinions," the reports, themselves, recognize that the foundation for and validity of Dr. Willner's opinions is indeed a function of the materials he reviewed and considered, thereby making exceedingly unlikely the insouciance suggested by the brief. This structure is faithful to Rule 26(a)(2)(B).

Under that Rule, the section of an expert report that is required to list the materials relied on plays a critical role providing notice to a party opponent of the underpinning of the expert's ultimate conclusion. Subsection (i) of the Rule requires a "complete statement of all opinions the witness will express and the basis and reasons for them." Subsection (ii) requires an itemization of "the facts or data considered by the witness in forming them." Thus, contrary to Mr. Brooks' testimony at his deposition, the "Materials considered" sections of Dr. Willner's reports cannot be considered peripheral or insignificant, as Fujitsu has tacitly argued. [6] Subsection (ii) necessarily recognizes that the value of any opinion, especially an expert opinion, "is proportioned to the sources that sustain it," *Petrogradsky Mejdunarodny Kommerchesky Bank v. National City Bank*, 253 N.Y. 23, 25, 170 N.E. 479, 483 (1930)(Cardozo, J.), and that in turn depends on what an expert reviews and considers. This rather obvious fact has been emphasized by the Seventh Circuit, *see e.g.*, *Huey v. United Parcel Service, Inc.,* 165 F.3d 1084, 1087 (7th Cir.1999), and Dr. Willner conceded as much at the hearing. (Tr. 34).

At bottom, Fujitsu's contention that the "Materials considered" sections of the two expert

---

[6] Mr. Brooks at his deposition sought to characterize the "Materials considered" sections of the reports as "boilerplate." in order to explain why he had not noticed the references to the 2008 contentions. in the reports. (Tellabs' Brief, Exhibit 17 at 16).

reports were not deemed sufficiently important by Dr. Willner and his several lawyers to have warranted careful review – thereby resulting in the two mistaken entries in ¶¶ 31 and 34 -- is not plausible, especially given the skill and experience of the several Fujitsu lawyers who participated in the multiple reviews of both reports, to say nothing of Dr. Willner's own reviews.

Where then does all this leave us? Two conclusions are possible: First, Dr. Willner never reviewed significant parts of his own reports even though he represented that he had. If that is true, he "cast aside his scholar's mantel and became a shill for [Fujitsu]." *Mid-State Fertilizer Co. v. Exchange National Bank of Chicago*, 877 F.2d 1333, 1340 (7th Cir.1989). Second, Dr. Willner indeed "reviewed and considered" the materials he represented he had, and among them were the July 2008 contentions. The evidence taken as a whole favors the latter conclusion. Thus, based on the evidence I heard and the demeanor of Dr. Willner and Mr. Cheng when they testified at the hearing, I reject the argument that there were two "mistakes" both of which went unnoticed despite multiple reviews by multiple readers, including Dr. Wilner, Mr. Cheng, and other lawyers at Orrick, including Mr. Brooks, who admitted at his deposition having read the reports "from start to finish." (Tellabs' Brief, Exhibit 17 at 17).[7]

---

[7] "The demeanor of a witness `... may satisfy the tribunal not only that the witness' testimony is not true but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies.'" *NLRB v. Walton Mfg. Co.*, 369 U.S. 404, 408 (1962). *See also Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985).

## B.
## The Testimony of Gino Cheng

Mr. Cheng is the managing associate of Fujitsu's counsel, Orrick, Harrington & Sutcliffe. He is a graduate of Yale University where he received his degree in engineering sciences (electrical) and attended the University of Oxford. He is a graduate of the Cardozo School of Law with an Intellectual Property Concentration. He said that he and attorney Michael Owens, who is no longer at the Orrick Firm, were the authors of those portions, among others, of Dr. Willner's expert reports containing ¶¶34 and 31, and that they chose which materials were to be included in their itemizations. Like Dr. Willner, he said that the references to the July 28 infringement contentions were in error, but that Fujitsu's lawyers could not figure out which lawyer made the drafting mistake. (Tr. 80-82). He said that he and Owens were involved in a joint effort, and that they reviewed each other's work. (Tr. 162).[8]

He said the supposed error in Paragraph 34 of the March 12, 2012 report was simply carried over into Paragraph 31 of the April. 2012 report. But he never could explain how the reference to the 2008 infringement contentions found their way into the March report in the first place – let alone why it was the first reference in the paragraph. He characterized the references in the reports to the July 28 infringement contentions as an "oversight." (Tr. 80). He said that the mistake in ¶34 of the March 12, 2012 report was simply "replicated" in ¶31 of the April 16, 2012 report. But that testimony is only partly accurate. Mr. Cheng said that while the reference to the 2008 infringement contentions appeared in both reports, ¶31 of the April report was not identical in all particulars. Quite the contrary, it had additional cites to materials on which Dr. Willner relied (Tr. 99, 172), thereby showing

---

[8]Mr. Owens did not testify and apparently is no longer with the Firm.

11

that the two paragraphs were not simply copied thoughtlessly and without review.

Mr. Cheng could not explain why in light of the supposed "conscious decision" to "insulate" and "isolate" Dr. Willner "from the 2008 [infringement] contentions," Mr. Brooks' "directive" to that effect, and the "multiple" reviews of Dr. Willner's reports by Dr. Willner and Fujitsu's lawyers, Messrs. Cheng, Wang, Brooks, Owens and Hivick, how ¶¶34 and 31 would have begun with an unambiguous reference to the 2008 infringement contentions. (Tr. 164-165, 169, 171).[9] And Mr. Cheng conceded that there were other references in those paragraphs which, in turn, made references to exhibits which relied on or had information about the forbidden 2008 infringement contentions. (Tr. 99-101). The depositions of various people at the Orrick Firm submitted by Fujitsu revealed that some individuals involved in the case are no longer with the Orrick Firm.

The claim that Orrick's administrative assistants had somehow mistakenly included the 2008 infringement contentions in the materials that had been FedEx'd to Dr. Willner after the December 2010 *Markman* hearing (Tr. 92) does not begin to explain the supposed "oversight" in including at all those critical contentions in both of Dr. Willner's expert reports, which were issued a month apart. (Tr. 172).

Mr. Cheng's alternate thesis was that the 2006 inspections could not have been utilized in any way in the 2008 infringement contentions since, to his knowledge, there was no English translation

---

[9] Mr. Brooks is a jet propulsion engineer, and he and Mr. Wang, are partners at the Orrick Firm (Tr. 168-169). Mr Wang was described by Mr. Cheng as the "most talented attorney I know." (Tr. 168). It is odd to say the least, that such talented and presumably punctilious lawyers, profoundly aware of the need to "insulate" and "isolate" Dr. Willner from the 2008 contentions and who reviewed "multiple times" the expert reports would have missed the conspicuous reference to the 2008 infringement contentions in ¶¶31 and 34 of the expert reports. Mr. Wang testified at his deposition that he did not believe he reviewed the entire report. (Wang Dep. Tr. 10). One would have thought that given the importance Mr. Brooks said he attributed to isolating Dr. Willner from the 2008 contentions, the accuracy of ¶¶ 34 and 31 should have assumed even greater significance than perhaps it otherwise would have in a case that did not present the same complexities as did this one.

of the whole report of that inspection until 2012. Hence, he argued, the 2008 infringement contentions could not have utilized the 2006 inspection assessment. (Tr. 175, *et seq.*). It was essentially the defense of impossibility. Indeed, Tellabs' counsel actually argued at the hearing that it really didn't matter whether Dr. Willner had seen the 2008 infringement contentions because "the 2008 contentions did not in any fashion at all incorporate the 2006 inspection." (Tr. 193).

Mr. Cheng claimed that the lawyers at Orrick never knew anything about the 2006 inspection when they crafted the 2008 contentions. (Tr. 124). I reject that testimony based on the evidence. In addition, Mr. Cheng did not arrive on the scene until 2008 and thus would have no knowledge of the sum of information that the Orrick Firm had received from Fujitsu in 2006, 2007, or 2008 before he joined the firm, other than what he was told or surmised. And we know nothing about what he was told, or by whom, or when.

There was no contention made, nor could there have been, that in the period 2006 to 2008, Orrick's lawyers were not in touch with Fujitsu's in-house counsel, Ms. Wright, or Mr. Fuji in Japan, who was fluent in English, was intimately knowledgeable about the 2006 inspection, and who conveyed that information to Fujitsu's in-house counsel. (Tr. 131-132, 134-139, 182-183). It is thus quite beside the point that it was not until 2012 that a "certified translation" of the entire report was "commissioned" by the Orrick firm (Tr. 176, 178), since the contents of the report would have been, and it is a fair inference, were communicated to Fujitsu's counsel in the United States by various people intimately involved in the inspection and its aftermath. (Tr. 134-144). Mr. Cheng was newly arrived on the scene in 2008, and his participation as a member of the Fujitsu team did not ensure he had knowledge of all that was going on – or at least there was no proof that he had such knowledge, and neither he nor Mr. Brooks (or anyone else) claimed that he did.

There is nothing speculative about inferring that there were communications regarding the 2006 inspection between Ms. Wright. and Mr. Fuji and Orrick's counsel. It is based upon the evidence (Tr. 131-144) and the commonly accepted way in which lawyers involved in a group endeavor function. But even putting this aside, the question that immediately comes to mind is, if the 2008 contentions did not factor in or incorporate the 2006 inspection, as was argued at the hearing, (Tr. 193), there would have been no need for Mr. Brooks' repeated representations to the court. But, "[Mr. Brooks]... must have thought the[y] added something to his case, as why else [did] he ma[k]e them?" *Brown v. Calamos,* 664 F.3d 123 (7th Cir. 2011). *Compare Schenck v. United States,* 249 U.S. 47 (1919)(Holmes, J.)("Of course the [representations] would not have been [made] unless [they] had been intended to have some effect...."); *United States v. Ladish Malting Co.,* 135 F.2d 484, 490 (7th Cir. 1998)("The prosecutor must have thought that the instruction mattered; why else so vigorously oppose Ladish's request for an actual-knowledge instruction").

And if the 2008 contentions did not factor in or incorporate the 2006 inspection, there would have been no need for Mr. Brooks to have made a "conscious decision" to "insulate" and "isolate" Dr. Willner from them or to have had "multiple" meetings and discussions with them to ensure compliance with the "directive" he issued to that effect. (Tr. 165). When Mr. Cheng was asked why, if the 2006 inspection was unconnected to the 2008 infringement contentions, Mr. Brooks would have gone to such lengths to insulate Dr. Willner from the 2006 inspection, all he could say was: "I'm not 1 hundred percent sure what his reasoning was – " (Tr. 164-165).

And, finally, if Fujitsu's newly emerged theory that the 2006 inspection was not linked to the 2008 infringement contentions, there certainly would have been no need for Fujitsu to have told Dr. Willner, as he admitted he had been told, that there could be a waiver of any protection that might

14

exist for the 2006 inspection materials if he admitted that he reviewed and considered the 2008 infringement contentions. (Tr. 26). Yet, all this in fact occurred, and it is idle for Fujitsu to now contend that it has no significance. In sum, Fujitsu's argument is feckless, and utterly implausible. Implausibility is a basis for rejection of testimony and evidentiary theories. *See, e.g., Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 575 (1985); *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Pinpoint, Inc. v. Amazon.Com, Inc*., 347 F.Supp.2d 579, 583 (N.D.Ill. 2004)(Posner, J.)(sitting by designation); *Tellabs Operations, Inc*., 2012 WL 1520333, 19, n12. (collecting cases).

Tellabs' cross-examination showed that Mr. Cheng was not testimonially competent within the meaning of Rule 602 of the Federal Rules of Evidence to testify to what occurred in the three years prior to the time he joined the Orrick firm in 2008, (Tr. 183), and that the fact that there may not have been a full English translation of the entire report prior to 2012 was not conclusive, and, standing alone, did not preclude the use of all or significant parts of the inspection results in formulating the 2008 infringement contentions. There were any number of Fujitsu people in Japan able to translate relevant portions of the report and transmit them to Tellabs' in-house counsel, Ms. Wright, or to Orrick's lawyers. As Mr. Bradley, Tellabs' counsel, aptly put it, "it is not a sole document issue." (Tr. 187).

Finally, Mr. Cheng testified that the Orrick lawyers had utilized the confidential Tellabs manuals that came with the modules purchased on eBay and which the Fujitsu engineers in Japan had used in the 2006 inspection, but they had "started afresh" in drafting the 2008 infringement contentions. (Tr. 197). When asked why they would have done that, Mr. Van Dyke – who had stressed that he had no involvement of any kind in connection with the matters involved in the hearing (Tr. 93) – interrupted the witness, preventing him from answering and offered this: "To protect the

15

privilege perhaps. That sounded flippant. I didn't mean it to sound flippant. Seemed like a good idea." (Tr. 197). Not only had Mr. Van Dyke made himself testimonially incompetent to arrive at this conclusion, having played, he said, no role in any of what went on in connection with the formulation or review of the reports, but he was not an appropriate witness under the rule that prohibits lawyers from simultaneously acting as advocate and witness. *United States. v. Morris*, 714 F.2d 669, 671 (7th Cir. 1983). His surmise, therefore, was of no import, and the question of why Orrick lawyers would start afresh went unanswered.

The claim made by Fujitsu at the hearing that the 2008 contentions were not traceable in any degree to the 2006 inspection had not been advanced before it was floated at the hearing. Shifting explanations undermine the credibility and persuasiveness of a position. *NLRB v. Dorothy Shamrock Coal Co.,* 833 F.2d 1263, 1268 (7th Cir.1987).

## C.
## The Documentary Evidence

### 1.

Tellabs also introduced through exhibits attached to its brief a wealth of documentary evidence to support its contention that Dr. Willner reviewed and considered Fujitsu's July 2008 infringement contentions, including claim charts asserting infringement of Fujitsu's '737 and '163 Patents. Those charts present Fujitsu's theories of infringement with respect to a Metro Input Amplifier Module (MIAM). (Tellabs' Brief Exhibit 1, at 1; Exhibit 2, at 1-2.)(where an exhibit is referred to *infra*, it is an exhibit attached to Tellabs' Brief). Both claim charts refer to a "61232 Metro Input Amplifier Module (MIAM)." (Exhibit 1, at 2; Exhibit 2, at 3).

In 2006, Fujitsu's engineers inspected a "Metro Input Amplifier Module," product number

"81.61232-SC." (Exhibit 3 ¶ 3 n.2 ).[10] Fujitsu's claim chart for the '737 Patent also refers to an optical supervisory channel module (OSCM) in both the text and the figures. (Exhibit 1, at 25, 28, 32, 52, 58-59, 65). In 2006, Fujitsu's engineers inspected an "Optical Supervisory Module ('OSCM,' P/N 81.61230)." (Exhibit 3 ¶ 3 n.2).

Fujitsu's claim charts for the '737 and '163 Patents also cite to "Tellabs 7100 General Description 76.7100/2 Revision A 9/02." (Exhibit 1, at 11, 18, 45, 64; Exhibit 2, at 14, 54). Fujitsu obtained the Tellabs' manuals when it purchased the Tellabs equipment on eBay, and Mr. Fuji maintained these highly confidential manuals. (*See* Exhibit 4, at 51, 98) (Deposition of Hitoshi Fuji). One of the manuals produced from Mr. Fuji's computer was the General Description manual for the Tellabs 7100 Optical Transport System, number 76.7100/2, revision A 9/02. (Exhibit 5 (manual and concordance data showing custodian Hitoshi Fuji).)

Although Mr. Fuji claimed that the engineers conducting the inspection of the Tellabs equipment did not have access to this manual (Exhibit 4, at 51), documents produced by Fujitsu belie this claim. For example, various documents show that the engineers actually reviewed and analyzed the manual.

On May 17, 2012, Fujitsu produced certain previously withheld documents pursuant to the Memorandum Opinion and Order of May 10, 2012. *Tellabs Operations, Inc.,* 2012 WL 1520333. These documents are dated November 2006 and are attributed to Mr. Tabuchi (*see*, *e.g.*, Exhibit 7, at FJIL5557082-83 (top right of each page)), one of the three Fujitsu engineers who inspected the Tellabs equipment purchased on eBay in 2006. (Exhibit 8 ¶ 8). These documents refer repeatedly to the "year

---

[10] Exhibit 3 is a page from Fujitsu's in-house counsel's Declaration submitted in support of Fujitsu's original motion for protective order that is discussed at length in *Tellabs Operations, Inc.,* 2012 WL 1520333.

2002 manual (attached to purchased unit)." (*See*, *e.g.*, Exhibit 7, at FJIL5557083-84).

These documents record information "From manyual [*sic*] FP1.3 (2002 manual)." (*See*, *e.g.*, Exhibit 7, at FJIL5557082-83 (top left of each page)). This is a reference to Tellabs' General Description manual, number 76.7100/2, revision A 9/02. Its copyright date is 2002 (Exhibit 5, title page), and it is labeled "FP 1.3" at the top of each page from the table of contents onward (Exhibit 5, page 2-iii *et seq*.).

At the hearing, Fujitsu sought to evade the force of these documents by having Mr. Cheng claim that none of this counts because none of it was used, and the Orrick lawyers started afresh. I do not credit that testimony. At least on the present record, Mr. Cheng's knowledge of what actually occurred in the years preceding his arrival is either non-existent or is based on what he was told by other Orrick lawyers at some unspecified time in the past. Fujitsu's lawyer made no attempt at the hearing to have Mr. Cheng explain the basis of his testimony. Thus, I reject it.[11]

**2.**

As discussed above, Dr. Willner's expert reports state that he "reviewed and considered" Fujitsu's July 28, 2008 Rule 3-1 Disclosures and attached exhibits (*e.g.*, for the '163 and '737 Patents)." (Exhibit 9 ¶ 34 (page 7); Exhibit 10 ¶ 31 (page 7). This statement appears in: (a) the Expert Report of Dr. Willner Regarding Infringement With Respect to U.S. Patent No. 7,227,681, U.S. Patent No. 5,521,737, and U.S. Patent No. 5,526,163 (Exhibit 9); and (b) in his expert report Regarding the Validity of U.S. Patent No. 7,227,681, U.S. Patent No. 5,521,737, and U.S. Patent No. 5,526,163

---

[11] As the proponent of the witness and the testimony, it was Fujitsu's burden to demonstrate evidentiary reliability. It did not do so. Obviously, I am not forced to accept at face value what Mr. Cheng or Dr. Willner said, especially under the circumstances. This is not intended as a reflection on Mr. Cheng's honesty or integrity, but simply to say that without a better foundation for his testimony, I cannot gauge its reliability.

(Exhibit 10).

"Fujitsu's July 28, 2008 Rule-3-1 Disclosures and attached exhibits (*e.g.*, for the '163 and '737 Patents)" refers to the infringement contentions and claim charts Fujitsu served on July 28, 2008 pursuant to Patent Rule 3-1 of the Eastern District of Texas. (Exhibit 11, at 5-6 (P.R. 3- 1(c). Both reports also list "Fujitsu's July 28, 2008 Rule 3-1 Disclosures" in the "Non-Exhaustive List of Documents Considered by Alan E. Willner." (Exhibit 9A, second page of table; Exhibit 10, Attachment A, at 2). In addition, exhibits to Dr. Willner's expert report on infringement make affirmative statements about the content of Fujitsu's July 2008 infringement contentions.

For example, exhibit W-8 to Dr. Willner's expert report on infringement states: "Fujitsu's '737 Patent July 2008 Infringement Contentions illustrated an exemplary configuration of Tellabs' 7100 system using MIAM, OLIM and DOSC modules." (Exhibit 9B, at 4. The next page of Exhibit W-8 presents figures representing the OLIM and MIAM modules "[i]dentified in 2008 contentions." (Exhibit 9B, at 5-6, 8-9). Similarly, Exhibit W-10 to Dr. Willner's expert report on infringement states: "Fujitsu's November 4, [*sic*: July 28], 2008 Infringement Contentions for the '163 Patent illustrated two exemplary configurations of Tellabs' 7100 system using the MIAM and LOAM-E modules respectively." (Exhibit 9C, at 3). The November 4, 2008 infringement contentions present a series of figures representing modules "[i]dentified in 2008 contentions." (*See*, *e.g.*, Exhibit 9C, at 5-11, 13-14). These affirmative statements about the content of Fujitsu's July 2008 infringement contentions support Tellabs' argument that Dr. Willner reviewed and considered the July 2008 infringement contentions just as he represented he did in both of his expert reports.

Finally, Exhibit W-8 to Dr. Willner's expert report on infringement relies on documents

originally cited in Fujitsu's July 2008 infringement contentions. In particular, Exhibit W-8 to that report cites "Tellabs® 7100 General Description, 76.7100FP33/2, Rev. B, 2/06 (2006)." Fujitsu's July 2008 infringement contentions cite the same document, having the same document number, revision, and date: "Tellabs® 7100 General Description, 76.7100FP33/2, Rev. B, 2/06 (2006)." (*See*, *e.g.*, Exhibit 1, at 2). This document was attached as Exhibit B-2 to Fujitsu's July 2008 infringement contentions. (Exhibit 1, at 2.) The only difference between the document cited in Exhibit W-8 to Dr. Willner's report and the document cited in Fujitsu's July 2008 infringement contentions are the *Bates* numbers. (*Compare* Exhibit 14 (from Fujitsu's July 2008 infringement contentions with Fujitsu *Bates* numbers) *with* Exhibit 15 (cited in Exhibit W-8 to Dr. Willner's expert report with Tellabs' *Bates* numbers)).

### 3.

The *Markman* hearing was held from November 30 to December 7, 2010, more than two years and eight months after Dr. Willner began working on this case (Exhibit 16 at 33). It is Tellabs contention that "it simply does not make sense that Dr. Willner would never have considered Fujitsu's theories of infringement during the course of claim construction, let alone for the entire two years and eight months that he worked on the case prior to the *Markman* hearing." There is a good deal of force to that argument.

When presented at his deposition with Exhibit W-8 to his expert report on infringement, Dr. Willner testified that he had reviewed that exhibit for accuracy prior to signing the report. That exhibit contained multiple references to the July 2008 infringement contentions. (Exhibit 16 at 40-42). Dr. Willner gave the same testimony when presented with multiple references to Fujitsu's 2008 infringement contentions in Exhibit W-10 of his expert report. (*See* Tellabs' Brief, Exhibit 16 at 43-

44).

Tellabs' argument in its brief that given the totality of the evidence, "the existence of numerous affirmative statements about the content of the July 2008 infringement contentions is simply not consistent with an accidental or careless error" is compelling.

**4.**

Other materials that Dr. Willner admitted having "reviewed and considered" incorporate the same analysis related to the 2006 inspection of the Tellabs' equipment that was presented in the July 2008 infringement contentions. First, paragraph 34 of Dr. Willner's expert report on infringement states that he has "reviewed and considered…Fujitsu's June 12, 2009 Motion for Leave to Amend the Disclosure of Asserted Claims and Infringement Contentions Pursuant to P.R. 3-6(b) (Dkt. 89, Case No.: 1:09-cv-4530) and attached exhibits (*e.g.*, for the '163 and '737 Patents)." Fujitsu attached claim charts to its motion on June 12, 2009, and these claim charts incorporated the same information and citations related to the 2006 inspection of the Tellabs equipment that were first presented in Fujitsu's original July 2008 infringement contentions.

Specifically, the amended 2009 claim charts for the '737 and '163 Patents present Fujitsu's theories of infringement with respect to a Metro Input Amplifier Module (MIAM). (Exhibit 23, at 1-2; Exhibit 24, at 1-2). Both claim charts specifically refer to a "**61232** Metro Input Amplifier Module (MIAM)." (Exhibit 23, at 4 (emphasis added); Exhibit 24, at 4 (emphasis added).) Fujitsu's 2009 claim chart for the '737 Patent also makes numerous references to an optical supervisory channel module (OSCM) in text and figures. (Exhibit 23, at 27, 30, 34, 54, 60-61, 67.) Finally, both charts cite to "Tellabs 7100 General Description **76.7100/2 Revision A 9/02**." (Exhibit 23, at 13, 20, 47, 66 (emphasis added); Exhibit 24, at 15, 55 (emphasis added).) This analysis relates directly to Fujitsu's

21

2006 inspection of the Tellabs' equipment. Mr. Cheng's attempt to say Fujitsu's counsel in this case merely started "afresh" and did not use any of the 2006 inspection of the same Tellabs equipment is not credible, lacks appropriate foundation, and is utterly unconvincing.

**5.**

Paragraph 34 of Dr. Willner's expert report on infringement states that he has "reviewed and considered…Fujitsu's June 16, 2011 Amended Disclosure of Asserted Claims and Infringement Contentions and attached exhibits (*e.g.*, for the '163 and '737 Patents)." Fujitsu's June 2011 infringement contentions included claim charts that incorporated the same information and citations related to the 2006 inspection of the Tellabs' equipment that were first presented in Fujitsu's original July 2008 infringement contentions. In particular, the amended 2009 claim charts for the '737 and '163 Patents both present Fujitsu's theories of infringement with respect to a Metro Input Amplifier Module (MIAM). (Exhibit 25, at 1-2; Exhibit 26, at 1-2.) Both claim charts specifically refer to a "**61232** Metro Input Amplifier Module (MIAM)." (Exhibit 25, at 4 (emphasis added); Exhibit 26, at 5 (emphasis added).) Fujitsu's 2009 claim chart for the '737 Patent also makes numerous references to an optical supervisory channel module (OSCM) in text and figures. (Exhibit 25, at 25, 28, 32, 52, 58-59, 67.) Finally, both claim charts cite to "Tellabs 7100 General Description **76.7100/2 Revision A 9/02**." (Exhibit 25, at 13, 19, 44, 66) (emphasis added); (Exhibit 26, at 17, 61) (emphasis added). This analysis relates directly to Fujitsu's 2006 inspection of the Tellabs' equipment.

**6.**

Paragraph 34 of Dr. Willner's expert report on infringement states that he "reviewed and considered…Fujitsu's October 20, 2011 Motion to Set a Schedule to Serve Final Contentions and in the Alternative to File Amended Final Infringement Contentions (Dkt. 397, Case No. 1:09-cv-4530)

22

and attached exhibits (*e.g.*, for all three optical amplifier patents)." Fujitsu attached copies of all previous infringement contentions to its motion, including: (a) Fujitsu's July 2008 infringement contentions (Case No. 1:09-cv-4530, Dkt. 414); (b) Fujitsu's June 2009 infringement contentions attached to Fujitsu's June 12, 2009 Motion for Leave to Amend the Disclosure of Asserted Claims and Infringement Contentions Pursuant to P.R. 3-6(b) (Case No. 1:09-cv-4530, Dkt. 399); and (c) Fujitsu's June 16, 2011 Amended Disclosure of Asserted Claims and Infringement Contentions (Case No. 1:09-cv-4530, Dkt. 400).

## 7.

Finally, paragraph 34 of Dr. Willner's expert report on infringement states that he "reviewed and considered... Fujitsu's November 16, 2011 Supplement to Its Memorandum of Law in Support of Its Motion to Set a Schedule to Serve Final Contentions and in the Alternative to File Amended Final Infringement Contentions (Dkt. 430, Case No. 1:09-cv-04530) and attached exhibits." Through this filing, Fujitsu "provide[d] the Court with the additional claim charts that Tellabs requested on October 27, 2011." (Case No. 1:09-cv-4530, Dkt. 428, at 1.). "These charts include four redlined comparisons between the of the [*sic*] **2008 infringement contentions** and the proposed infringement contentions for the '418, '737, '163, and '681 patents (Exhs. 24, 25, 26 and 27 respectively)." (*Id.* at 1)(emphasis added).

## CONCLUSION

Based on all of the evidence that is before me, I reject Fujitsu's claim that Dr. Willner did not review and consider the very information his two expert reports unqualifiedly avowed that he did. Not only did the first sentence of ¶¶31 and 34 of his March and April 2012 reports state that he reviewed and considered the July 2008 infringement contentions – which appeared as the first item in those

paragraphs – but there were numerous other exhibits that he reviewed that referred to and relied on those contentions. How the contentions became a part of the materials Dr. Willner considered is unclear. Their inclusion may well have been the result of a mistake. But included they were, and there was nothing mistaken about Dr. Willner's certification that he had "reviewed and considered" the 2008 infringement contentions.

Dr. Willner and Mr. Cheng may well be certain that their recollection of events is accurate. But as Justice Holmes famously said, "certitude is not the test of certainty." Holmes, *Natural Law*, 32 Harv. L.Rev. 40, 41 (1918) – a proposition the Supreme Court has recognized, *Winters v. New York,* 333 U.S. 507, 536 (1948), as has the Seventh Circuit, especially in the context of the accuracy of witnesses' memories. *See e.g., United States v. Bartlett,* 567 F.3d 901, 906 (7th Cir. 2009)("'The basic problem about testimony from memory is that most of our recollections are not verifiable. The only warrant for them is our certitude, and certitude is not a reliable test of certainty.'"); *Jarad v. Gonzales*, 461 F.3d 867, 871 (7th Cir. 2006) ("Memory often plays tricks.... People may remember what they want to remember, whether it happened or not, and the lack of correlation between the strength and accuracy of one's recollection is one of the most important findings of the psychology of memory."); *Newsome v. McCabe,* 319 F.3d 301, 305 (7th Cir.2003)("'[T]he mere fact that we remember something with great confidence is not a powerful warrant for thinking it true.'").

But apart from any question of memory is the utter improbability of Fujitsu's story. We are asked to believe that an eminent professor, keenly aware of the need for accuracy, "mistakenly" represented in separate reports that in forming his opinions he had "reviewed and considered" Fujitsu's 2008 invalidity contentions, when all the while those contentions had been lying on the floor

of his office, unnoticed and unreviewed for two years.[12] We are asked further to believe that even though the first line of ¶¶34 and 31 of the March and April 2012 reports lists the 2008 infringement contentions as having been reviewed and considered by Dr. Willner, and even though there was an overarching directive from Mr. Brooks that Dr. Willner was to be insulated from the 2008 infringement contentions, and even though the expert reports were reviewed multiple times by at least Dr. Willner and Messrs. Cheng, Wang, Brooks, Owens and Hivick of the Orrick firm, the references to the 2008 infringement contentions in the first sentence of ¶¶34 and 31 were overlooked.

And if this astonishing series of "coincidences" and "mistakes" were not enough, we are asked further to believe that even if Dr. Willner had "reviewed and considered" the 2008 contentions and all of the various exhibits to his reports that referred to and relied on in some fashion those contentions, it does not matter since the 2008 contentions did not, in any fashion, incorporate the 2006 inspection. (Tr. 193). But if that be so, why then would Mr. Brooks have labored to insulate Dr. Willner from the 2008 infringement contentions, and why would he have so painstakingly instructed his team of lawyers at Orrick of the need for that insulation? And finally, if it did not matter whether Dr. Willner considered the 2008 contentions, why was he recently told by Fujitsu's lawyers that if he conceded having reviewed them there could be a waiver of any claim that the 2006 inspection is privileged. To ask the questions is to answer them. Fujitsu's position that this was all an inadvertent error – and a harmless one at that – is not supported by the evidence.

Mistakes are inherent in the human condition. All judges make them, and so do lawyers and

---

[12] Dr. Willner is so attentive to detail that in his *curriculum vitae* he has 35 separate line items for his students' evaluation of him year by year from 1992 through 2010. Each line item follows the same basic format. For example: "Fall 92: 5.0/5.0, 13 students, all had evaluated." The only variances are for the number of students making an evaluation, the year of the evaluations, and the actual evaluation which was done on a 5.0 system." So meticulous is Dr. Willner, that he even lists an evaluation done in 1987 while he was a graduate student at Columbia. [#467-1 at p.14].

25

experts. But claims of a series of improbable events can carry a party only so far. *Nilssen v. Osram Sylvania, Inc.,* 504 F.3d 1223, 1235 (Fed. Cir. 2007). In isolation, perhaps one of what Mr. Cheng euphemistically called "oversights" might be dismissed as mere coincidence. But, when all the evidence is considered, the claim of coincidental error is implausible, at best. What the Supreme Court said long ago in *Coggeshall v. United States,* 69 U.S. 383 (1865) applies here: "Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof." *Cf., Murdaugh Volkswagen, Inc. v. First Nat. Bank of South Carolina*, 639 F.2d 1073 (4th Cir. 1981)("coincidence piled on coincidence can ultimately constitute sufficient evidence to permit" a fact-finder to conclude that the claim of innocent error is unacceptable); *In re Elm St in City of New York*, 246 N.Y. 72 (1927)(Cardozo, J.)(" If we may not say of such a coincidence that it is literally impossible, at least we may say that one would be surprising, and several would be marvelous.").

In sum, based on the testimony adduced at the hearing, the demeanor of the witnesses at the hearing, and the deposition testimony and the documentary evidence submitted by the parties, I am unable to accept Fujitsu's thesis that Dr. Willner did not review and consider the 2008 infringement contentions, and that even if he did, it is inconsequential. The evidence does not begin to support Fujitsu's argument and, it warrants a contrary conclusion. To the extent that this opinion may vary in any way from comments made or questions asked during the hearing, this Opinion is controlling. *See O'Neill v. AGWI Lines*, 74 F.3d 93, 95 (5th Cir. 1995); *Harbor Tug & Barge v. Belcher Towing*, 733 F.2d 823, 827 n. 3 (11th Cir. 1984).

The bottom line is that Tellabs is entitled to all of the documents generated in connection with

the 2006 inspection of Tellabs' three modules and Fujitsu is ordered to immediately produce the documents that comprise Fujitsu's 2006 inspection of the Tellabs modules purchased on eBay.  This ruling moots Tellabs' "Motion to Compel Production of Documents Related to Fujitsu's 2006 Inspection of Tellabs' Equipment Because Fujitsu Has Waived its Arguments Regarding Attorney-Client Privilege." [#674].

DATE: 8/29/12                    ENTERED:_____
                                        UNITED STATES MAGISTRATE JUDGE